POLISH NATIONAL ALLIANCE OF THE UNITED STATES OF NORTH AMERICA *v.* NATIONAL LABOR RELATIONS BOARD.

No. 226.   Argued January 11, 12, 1944.—Decided June 5, 1944.

*Mr. Ewart Harris,* with whom *Mr. Casimir E. Midowicz* was on the brief, for petitioner.

*Attorney General Biddle,* with whom *Solicitor General Fahy, Messrs. Robert L. Stern, Alvin J. Rockwell, Frank Donner,* and *Miss Ruth Weyand* were on the brief, for respondent.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

The National Labor Relations Board, having found that petitioner, in violation of the National Labor Rela-

tions Act, had engaged in unfair labor practices, issued an order of cessation against it. 42 N. L. R. B. 1375. On a petition for review and a cross-petition of the Board for enforcement, the Circuit Court of Appeals for the Seventh Circuit sustained the order. 136 F. 2d 175. Of the numerous issues before that court only two are open here, the importance of which led us to grant certiorari. 320 U. S. 725. The questions are these: (1) In view of the petitioner's activities, is the conduct found by the Board to constitute unfair labor practices within the scope of the National Labor Relations Act; (2) if Congress has proscribed such conduct, has it exceeded its power to regulate commerce among the several States?

The Polish National Alliance is a fraternal benefit society providing death, disability, and accident benefits to its members and their beneficiaries. Incorporated under the laws of Illinois, it is organized into 1,817 lodges scattered through twenty-seven States, the District of Columbia, and the Province of Manitoba, Canada. As the "largest fraternal organization in the world of Americans of Polish descent," it had outstanding, in 1941, 272,897 insurance benefit certificates with a face value of nearly $160,000,000. Over 76% of these certificates were held by persons living outside of Illinois. At the end of that year, petitioner's assets totalled about $30,000,000, in cash, real estate in five States, United States Government bonds, foreign government bonds, bonds of various States and their political subdivisions, railroad, public utility, and industrial bonds, and stocks. From its organization in 1880 until the end of 1940, the Alliance spent over $7,000,000 for charitable, educational, and fraternal activities among its members. During the same period, it paid out over $38,000,000 in "mortuary claims."

Petitioner directs from its home office in Chicago a staff of over 225 full and part-time organizers and field agents in twenty-six States whose traveling expenses are

borne by Alliance and who receive commissions for new memberships. Since its 1939 convention, Alliance has admitted no more "social members." Thereafter, all applicants have been required to buy insurance certificates providing various types of life, endowment, and term coverage. These policies contain the typical loan, cash surrender value, optional settlement, and dividend provisions. Petitioner spent over $10,000 for advertising outside of Illinois during 1941. It employs a Georgia credit company to report on the financial standing and character of the applicants, and reinsures substandard risks with an Indiana company.

Alliance lodges are organized into 190 councils, 160 of which are outside the State of Illinois. The councils elect delegates to the national convention, and it in turn elects the executive and administrative officers. The Censor of Alliance is its ranking officer and he appoints an editorial staff which publishes a weekly paper distributed to members. Of the 6,857,556 copies published in 1941, about 80% were mailed to persons living outside of Illinois.

This summary of the activities of Alliance and of the methods and facilities for their pursuit amply shows the web of money-making transactions woven across many state lines. An effective strike against such a business enterprise, centered in Chicago but radiating from it all over the country, would as a practical matter certainly burden and obstruct the means of transmission and communication across these state lines. Stoppage or disruption of the work in Chicago involves interruptions in the steady stream, into and out of Illinois, of bills, notices, and policies, the payments of commissions, the making of loans on policies, the insertion and circulation of advertising material in newspapers, and its dissemination over the radio. The effect of such interruptions on commerce is unmistakable. The load of interstate communication

and transportation services is lessened, cash necessary for interstate business becomes unavailable, the business, interstate, of newspapers and radio stations suffer. Nor is this all. Alliance, it appears, plays a credit rôle in interstate industries, railroads, and other public utilities. In 1941, it acquired securities in an amount in excess of $11,-000,000, and sold or redeemed securities costing more than $7,500,000. Financial transactions of this magnitude cannot be impeded even temporarily without affecting to an extent not negligible the interstate enterprises in which the large assets of Alliance are invested. That such are the substantial effects on interstate commerce of dislocating labor practices by insurance companies, was established before the Labor Board in at least thirteen comparable situations.[1] The practical justification of such a conclusion has not heretofore been challenged. Considerations like these led the Board to find that petitioner's practices "have a close, intimate, and substantial relation to trade, traffic, and commerce among the several States and tend to lead to labor disputes burdening and obstructing commerce," and were therefore "unfair labor practices affecting commerce within the

---

[1] Matter of John Hancock Mutual Life Insurance Co., 26 N. L. R. B. 1024; Matter of Life Insurance Co. of Virginia, 29 N. L. R. B. 246; Matter of Life Insurance Co. of Virginia, 31 N. L. R. B. 674; Matter of Supreme Liberty Life Insurance Co., 32 N. L. R. B. 94; Matter of Life Insurance Co. of Virginia, 38 N. L. R. B. 20; Matter of Colonial Life Insurance Co. of America, 42 N. L. R. B. 1177; Matter of Metropolitan Life Insurance Co., 43 N. L. R. B. 962; Matter of Prudential Insurance Co. of America, 46 N. L. R. B. 430; Matter of Northwestern Mutual Fire Association, 46 N. L. R. B. 825; Matter of Peoples Life Insurance Co. of Washington, D. C., 46 N. L. R. B. 1115; Matter of Prudential Insurance Co. of America, 47 N. L. R. B. 1103; Matter of Prudential Insurance Co. of America, 49 N. L. R. B. 450; Matter of Life and Casualty Insurance Co. of Tennessee, 53 N. L. R. B. 1196. See also *Labor Board* v. *Bank of America*, 130 F. 2d 624, 626.

meaning of Section 2 (6) and (7)," and as such, prohibited by § 10 of the Wagner Act.

By that Act, Congress in order to protect interstate commerce from adverse effects of labor disputes has undertaken to regulate all conduct having such consequences that constitutionally it can regulate. *Labor Board* v. *Jones & Laughlin Corp.*, 301 U. S. 1, 31; *Labor Board* v. *Fainblatt*, 306 U. S. 601, 607. With negligible exceptions, Congress did not exercise its power to regulate commerce prior to its enactment in 1887 of the Interstate Commerce Act. 24 Stat. 379, 49 U. S. C. § 1 *et seq.* Since that time it has frequently chosen, as the Statutes at Large abundantly prove, to regulate only part of what it constitutionally can regulate. Again, half a dozen enactments, other than the National Labor Relations Act, are sufficient to illustrate that when it wants to bring aspects of commerce within the full sweep of its constitutional authority, it manifests its purpose by regulating not only "commerce" but also matters which "affect," "interrupt," or "promote" interstate commerce. See, for example, Act of June 18, 1934, § 2, 48 Stat. 979, 18 U. S. C. § 420a; Bituminous Coal Act, § 4–A, 50 Stat. 72, 83, 15 U. S. C. § 834; Civil Aeronautics Act, § 1 (3), 52 Stat. 973, 977, 49 U. S. C. § 401 (3); Federal Employers' Liability Act, § 1, as amended, 53 Stat. (part 2) 1404, 45 U. S. C. § 51; Transportation Act of 1920, § 307 (b) (3), 41 Stat. 456, 471; Tennessee Valley Authority Act, § 31, 49 Stat. 1075, 1080, 16 U. S. C. § 831dd. In so describing the range of its control, Congress is not indulging stylistic preferences; it is mediating between federal and state authorities, and deciding what matters are to be taken over by the central Government and what to be left to the States. *United States* v. *Darby*, 312 U. S. 100; *Kirschbaum Co.* v. *Walling*, 316 U. S. 517. And so in this Act, unlike some federal regulatory measures, see *Federal Trade Comm'n* v. *Bunte Bros.*, 312 U. S. 349, 351; *Kirschbaum Co.* v. *Wal-*

*ling, supra,* at 522–523, Congress has explicitly regulated not merely transactions or goods in interstate commerce but activities which in isolation might be deemed to be merely local but in the interlacings of business across state lines adversely affect such commerce. By the Wagner Act, Congress gave the Board authority to prevent practices "tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce." § 2 (7) of the National Labor Relations Act (49 Stat. 449, 450, 29 U. S. C. § 152 (7)). Congress therefore left it to the Board to ascertain whether proscribed practices would in particular situations adversely affect commerce when judged by the full reach of the constitutional power of Congress. Whether or no practices may be deemed by Congress to affect interstate commerce is not to be determined by confining judgment to the quantitative effect of the activities immediately before the Board. Appropriate for judgment is the fact that the immediate situation is representative of many others throughout the country, the total incidence of which if left unchecked may well become far-reaching in its harm to commerce. *Labor Board* v. *Fainblatt, supra,* at 607–608.

We have said enough to indicate the ground for our conclusion that the Board was not unjustified in finding that the unfair labor practices found by it would affect commerce. And the undoubted fact that Alliance promotes, among Americans of Polish descent, interest in, and devotion to, the contributions that Poland has made to civilization does not subordinate its business activities to insignificance. Accordingly, the Board could find that its cultural and fraternal activities do not withdraw Alliance from amenability to the Wagner Act.

In this aspect, the case we have before us presents a wholly new problem of the relation of federal authority to the business of insurance. The long series of insurance cases that have come to this Court for more than seventy-

five years, from *Paul* v. *Virginia,* 8 Wall. 168, to *New York Life Ins. Co.* v. *Deer Lodge County,* 231 U. S. 495, have invariably involved some exercise of state power resisted, in most instances, on the claim that it was impliedly forbidden by the Commerce Clause. Such was the context in which this Court decided again and again that the making of a contract of insurance is not interstate commerce and that, since the business of insurance is in effect merely a congeries of contracts, the States may, for taxing and diverse other purposes, regulate the making of such contracts and the insurance business free from the limitations imposed upon state action by the Commerce Clause. Constitutional questions that look alike often are altogether different and call for different answers because they bring into play different provisions of the Constitution or different exertions of power under it. Thus, federal regulation does not preclude state taxation and state taxation does not preclude federal regulation. Compare, for example, *Heisler* v. *Thomas Colliery Co.,* 260 U. S. 245, with *Sunshine Coal Co.* v. *Adkins,* 310 U. S. 381.

We have, therefore, now presented for the first time not an exercise of state but of national power in relation to the insurance business. And so the ultimate question is whether, in view of the relation between the activities of the insurance business before us and the operation of economic forces across state lines, the Constitution denies to Congress the power to say that the interplay of the insurance business and those economic forces is such that its power "to regulate Commerce . . . among the several States" carries with it the power to regulate the conduct here regulated by relevant legislation.

The process of adjusting the interacting areas of national and state authority over commerce has been reflected in hundreds of cases from the very beginning of our history. Precisely the same kind of issues has plagued

the two great English-speaking federations, the constitutions of which similarly distribute legislative power over business between central and subordinate governments. See § 91 of the British North America Act, 1867, 30 & 31 Vict., c. 3, and Report of the (Canadian) Royal Commission on Dominion-Provincial Relations, (1940) Bk. II, c. IV; § 51 of the Australia Constitutional Act, 1900, 63 & 64 Vict., c. 12, and Report of the (Australian) Royal Commission on the Constitution, (1929) c. XIV. These are difficulties inherent in such a federal constitutional system.

The interpenetrations of modern society have not wiped out state lines. It is not for us to make inroads upon our federal system either by indifference to its maintenance or excessive regard for the unifying forces of modern technology. Scholastic reasoning may prove that no activity is isolated within the boundaries of a single State, but that cannot justify absorption of legislative power by the United States over every activity. On the other hand, the old admonition never becomes stale that this Court is concerned with the bounds of legal power and not with the bounds of wisdom in its exercise by Congress. When the conduct of an enterprise affects commerce among the States is a matter of practical judgment, not to be determined by abstract notions. The exercise of this practical judgment the Constitution entrusts primarily and very largely to the Congress, subject to the latter's control by the electorate. Great power was thus given to the Congress: the power of legislation and thereby the power of passing judgment upon the needs of a complex society. Strictly confined though far-reaching power was given to this Court: that of determining whether the Congress has exceeded limits allowable in reason for the judgment which it has exercised. To hold that Congress could not deem the activities here in question to affect what men of practical affairs would call commerce, and to deem them

related to such commerce merely by gossamer threads and not by solid ties, would be to disrespect the judgment that is open to men who have the constitutional power and responsibility to legislate for the Nation.

*Judgment affirmed.*

MR. JUSTICE ROBERTS took no part in the consideration or disposition of this case.

MR. JUSTICE BLACK, concurring:

The National Labor Relations Act does not vest courts with power to review the evidence presented to the Labor Board and make independent findings of fact. 29 U. S. C. 160 (e). Therefore the propriety of the Board's order in this case must be considered on the basis of the facts the Board found.

The Board did not exercise jurisdiction and enter its order on a fact finding that petitioner's insurance activities merely affected commerce in types of interstate business other than its own. On this fact issue it made no finding at all. Its finding was that the petitioner, being "engaged in the insurance business," was "engaged in commerce within the meaning of the Act." This ultimate finding of fact rested on detailed subordinate findings which revealed the widespread interstate activities of the petitioner in carrying on its insurance business. As the Court's opinion points out, these insurance activities involved a "steady stream, into and out of Illinois, of bills, notices, and policies, the payments of commissions, the making of loans on policies, the insertion and circulation of advertising material in newspapers, and its dissemination over the radio." Only on the basis of the ultimate finding that petitioner was itself "engaged in commerce" did the Board make the essential further finding that petitioner's refusal to bargain collectively with its employees had a "close, intimate, and substantial relation to com-

merce among the several States" and tended "to lead to labor disputes burdening and obstructing commerce."

As a conclusion of law the Board stated that petitioner's unfair labor practices constituted "unfair labor practices affecting commerce, within the meaning of Section 2 (6) and (7) of the Act." Section 2 (6) defines the term "commerce" to mean "trade, traffic . . ."; and § 2 (7) defines the term "affecting commerce" to mean either "in commerce" or "burdening or obstructing commerce." 49 Stat. 449, 450; 29 U. S. C. 152 (6) and (7). From the language of these definitions, and the Board's findings above described, it is apparent that the Board's conclusion of law that "commerce" was "affected" by petitioner's unfair labor practices rested upon its previous conclusion of fact that petitioner's insurance business was engaged in commerce. The Board concluded that, since the insurance business itself was engaged in commerce, petitioner's refusal to bargain, and the strike thereby provoked, would affect commerce. Compare *Associated Press* v. *Labor Board,* 301 U. S. 103, 128–130 with *Consolidated Edison Co.* v. *Labor Board,* 305 U. S. 197, 219–224.

The doctrine that Congress may provide for regulation of activities not themselves interstate commerce, but merely "affecting" such commerce, rests on the premise that in certain fact situations the federal government may find that regulation of purely local and intrastate commerce is "necessary and proper" to prevent injury to interstate commerce. *Houston, E. & W. T. Ry. Co.* v. *United States,* 234 U. S. 342; *Second Employers' Liability Cases,* 223 U. S. 1, 46–47; and see *Wickard* v. *Filburn,* 317 U. S. 111, 121. In applying this doctrine to particular situations this Court properly has been cautious, and has required clear findings before subjecting local business to paramount federal regulation. *City of Yonkers* v. *United States,* 320 U. S. 685, and cases therein cited. It has insisted upon "suitable regard to the principle that

whenever the federal power is exerted within what would otherwise be the domain of state power, the justification of the exercise of the federal power must clearly appear." *Id.; Florida* v. *United States,* 282 U. S. 194, 211–212; cf. *Phelps Dodge Corp.* v. *Labor Board,* 313 U. S. 177, 196–197; *Securities & Exchange Comm'n* v. *Chenery Corp.,* 318 U. S. 80, 92–95.

The Board not having found as a fact that petitioner's life insurance business affected interstate activities of other businesses, the first issue is whether the Board's findings that petitioner's insurance activities were conducted across state lines are supported by evidence. I think they are. This leads to the question, chiefly argued by both parties, "Is the business of insurance commerce, and, when conducted across state lines, subject to federal regulation as such under the Commerce Clause of the Constitution?" For the reasons given in the Court's opinions in this case and in *United States* v. *South-Eastern Underwriters Association,* 322 U. S. 533, I agree that the business of insurance is commerce, subject to federal regulation as such when conducted across state lines, and that the Board's order was proper.

MR. JUSTICE DOUGLAS and MR. JUSTICE MURPHY join in this opinion.