C. EDWARD BROWN, Plaintiff, v. UTICA MUTUAL INSURANCE COMPANY, Defendant.*

Supreme Court, Special Term, Erie County, January 18, 1945.

---

* See *McCarthy* v. *American Surety Co.*, 183 Misc. 983.— [REP.

*Morgan F. Bisselle* for defendant.

*Howard F. Cunningham* for plaintiff.

JAMES, J. Defendant assaults the complaint herein on the ground that it appears on its face that it does not state facts sufficient to constitute a cause of action and moves for its dismissal under rule 106 of Rules of Civil Practice.

Plaintiff alleges that defendant, a domestic insurance corporation having its principal office and place of business at Utica, New York, "is engaged in the business of writing and issuing automobile liability insurance, personal accident and health insurance, workmen's compensation, and general liability insurance in the State of New York, State of Pennsylvania, and other states in the United States of America, and duly licensed to do business in said states, and as such was, and is engaged in Interstate Commerce."

He further alleges that, between October 24, 1938, and November 15, 1940, both dates inclusive, he "was employed by the defendant as a claim adjuster, engaged in the routine work of investigating, adjusting and settling public liability, automobile liability, and workmen's compensation claims against various assureds of the defendant, within the State of New York, and in the State of Pennsylvania, and that as such, (he) was engaged in Interstate Commerce in performing his duties for and on behalf of the said defendant, with the knowledge, consent and approval of the defendant, and in said employer's interest."

In his *first* cause of action, plaintiff claims various amounts of pay for overtime between October 24, 1938, and November 15, 1940, making a total of $2,076.92, and bases his right to recover on subdivision (a) of section 7 of the Fair Labor Standards Act of 1938 (U. S. Code, tit. 29, § 207, subd. [a]). In his *second* cause of action he claims a further $2,076.92 as liquidated damages, and a reasonable attorney's fee and bases his right to recover on subdivision (b) of section 16 of said Act (U. S. Code, tit. 29, § 216, subd. [b]).

The Fair Labor Standards Act of 1938 does not mention insurance companies or claim adjusters. Its purpose is stated in section 2 (U. S. Code, tit. 29, § 202) entitled "Finding and declaration of policy." This specifies five "conditions" which Congress intends to correct and eliminate through the exercise "of its power to regulate commerce among the several States." Subdivision (a) of section 6 (U. S. Code, tit. 29, § 206, subd. [a]) provides: "Every employer shall pay to each of his employees

who is engaged in commerce or in the production of goods for commerce wages at the following rates * * * ." The term " commerce " is thus defined in subdivision (b) of section 3: " ' Commerce ' means trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof " (U. S. Code, tit. 29, § 203, subd. [b]).

Counsel have pointed to no judicial decision and this court has found none which holds that this act applies to insurance business or the work of insurance claim adjusters. For seventy-five years prior to June 5, 1944, the United States Supreme Court had repeatedly held that insurance business is not com merce. On that day, it decided in *U. S.* v. *Underwriters Assn.* (322 U. S. 533) that interstate insurance business is governed by the Sherman Antitrust Act, and in *Polish Alliance* v. *Labor Board* (322 U. S. 643) that such business is governed by the National Labor Relations Act (U. S. Code, tit. 29, § 151 *et seq.*) The commerce clause of the United States Constitution (art. I, § 8) now covers interstate insurance business.

Does the Fair Labor Standards Act of 1938 apply to interstate insurance business and the work of insurance claim adjusters? It seems probable that the United States Supreme Court would now hold that it applies to such business. As to employees protected by the act, it has said: " The history of the legislation leaves no doubt that Congress chose not to enter areas which it might have occupied. * * * Since the scope of the Act is not coextensive with the limits of the power of Congress over commerce, the question remains whether these employees fall within the statutory definition of employees ' engaged in commerce or in the production of goods for commerce,' construed as the provision must be in the context of the history of federal absorption of governmental authority over industrial enterprise." (*Kirschbaum Co.* v. *Walling*, 316 U. S. 517, 522–523. *Vide,* also, *Higgins* v. *Carr Bros. Co.*, 317 U. S. 572, 574; *Stoike* v. *First National Bank*, 290 N. Y. 195, 201, 202, certiorari denied 320 U. S. 762.)

Plaintiff does not allege that he was engaged " in the production of goods for commerce." After reciting his activities, he alleges " that as such, (he) was engaged in Interstate Commerce in performing his duties for and on behalf of the said defendant." Although his activities were limited to " the routine work of investigating, adjusting and settling " claims made by third parties against defendant's assureds, we shall, on this motion, assume that his allegation is true.

Does the complaint state facts sufficient to constitute a cause of action? To answer this, we must consider the legal effect of the decision of June 5, 1944, in *U. S.* v. *Underwriters Assn.* (322 U. S. 533, *supra*).

In enacting the Fair Labor Standards Act of 1938, Congress expressed its intent to exercise "its power to regulate commerce among the several States" (Fair Labor Standards Act of 1938, § 2, subd. [b]; U. S. Code, tit. 29, § 202, subd. [b]). In the last-cited case, Mr. Justice BLACK, delivering the opinion of the court, said (p. 534): "For seventy-five years this Court has held, whenever the question has been presented, that the Commerce Clause of the Constitution does not deprive the individual states of power to regulate and tax specific activities of foreign insurance companies which sell policies within their territories. Each state has been held to have this power even though negotiation and execution of the companies' policy contracts involved communications of information and movements of persons, moneys, and papers across state lines. Not one of all these cases, however, has involved an Act of Congress which required the Court to decide the issue of whether the Commerce Clause grants to Congress the power to regulate insurance transactions stretching across state lines. Today for the first time in the history of the Court that issue is squarely presented and must be decided."

Further on in his opinion, Mr. Justice BLACK said (p. 543): "In 1869 this Court held, in sustaining a statute of Virginia which regulated foreign insurance companies, that the statute did not offend the Commerce Clause because ' issuing a policy of insurance is not a transaction of commerce '. *Paul* v. *Virginia,* 8 Wall. 168, 183. Since then, in similar cases, this statement has been repeated, and has been broadened. In *Hooper* v. *California,* 155 U. S. 648, 654, 655, decided in 1895, the *Paul* statement was reaffirmed, and the Court added that, ' The business of insurance is not commerce.' In 1913 the New York Life Insurance Company, protesting against a Montana tax, challenged these broad statements, strongly urging that its business, at least, was so conducted as to be engaged in interstate commerce. But the Court again approved the *Paul* statement and held against the company, saying that ' contracts of insurance are not commerce at all, neither state nor interstate '. *New York Life Ins. Co.* v. *Deer Lodge County,* 231 U. S. 495, 503–504, 510."

Further cases are cited in note 18 in 322 United States 544. In the latest of these cases, *Colgate* v. *Harvey* (296 U. S. 404,

432), it is said: "Insurance companies issuing policies are found in every state; and the activities of the larger companies overflow state lines and extend into every part of the country. But insurance is not commerce; and the right of a citizen to take out a policy in one state, insuring property in another where he resides, cannot be protected under the commerce clause."

The Fair Labor Standards Act of 1938 was nearly six years old when the United States Supreme Court decided the *Underwriters Assn.* case (*supra*). During that time it had never decided that this act covers interstate insurance business or insurance claim adjusters.

"But what happens to old statutes when the Supreme Court gives us a new Constitution? Do federal statutes written in 1890, 1914, or 1935 expand like an accordion when the Supreme Court takes a more generous view of Congressional power and gives them more room to operate?" (Charles Stuart Lyon on Old Statutes and New Constitution, 44 Col. L. Rev., 599, 600.)

This question is still undecided in respect to the act of 1938. The Supreme Court in the *Underwriters Assn.* case (*supra*) reversed the judgment of the District Court, which sustained a demurrer to an indictment under the Sherman Antitrust Act and directed that the indictment be dismissed (51 F. Supp. 712). In the *Polish Alliance* case (322 U. S. 643, *supra*) it held that the insurance company had been guilty of unfair labor practices and affirmed a judgment of the Circuit Court of Appeals which had sustained a cease and desist order of the National Labor Relations Board. The court, however, in both cases, held that Congress has power under the commerce clause to regulate interstate insurance business.

Although the Supreme Court has not yet specifically applied the Fair Labor Standards Act of 1938 to interstate insurance business or insurance claim adjusters, the assumption that it would do so is a logical one. The act expressly declares the intent of Congress to exercise "its power to regulate commerce among the several States". (Fair Labor Standards Act of 1938, § 2, subd. [b]; U. S. Code, tit. 29, § 202, subd. [b].) It declares that *every* employer shall pay to *each* of his employees who is engaged in commerce or in the production of goods for commerce a certain wage (Act, § 6, subd. [a]; U. S. Code, tit. 29, § 206, subd. [a]) and that *no* employer, except as otherwise provided in the section, shall employ *any* of his employees so engaged longer than the hours specified (Act, § 7, subd. [a]; U. S. Code, tit. 29, § 207, subd. [a]). There are certain exemp-

tions which apply to these two sections (Act, § 13; U. S. Code, tit. 29, § 213) but the employer has the burden of proving them. (See cases cited in note 21 to section 213 of title 29 of United States Code Annotated in 1944 Cumulative Annual Pocket Part.)

Does this act apply to plaintiff's employment between October 24, 1938, and November 15, 1940? Defendant's counsel argues that it does not because the recent decisions of the United States Supreme Court that interstate insurance business is covered by the commerce clause are not retrospective in this case. The principle on which he relies is stated as follows in Ruling Case Law (Vol. 7, Courts, § 36): " The general principle is that a decision of a court of supreme jurisdiction overruling a former decision is retrospective in its operation, and the effect is not that the former decision is bad law, but that it never was the law. To this the courts have established the exception that where a constitutional or statute law has received a given construction by the courts of last resort, and contracts have been made and rights acquired under and in accordance with such construction, such contracts may not be invalidated nor vested rights acquired under them impaired by a change of construction made by a subsequent decision. * * * The true rule in such cases is held to be to give a change of judicial construction in respect to a statute the same effect in its operation on contracts and existing contract rights that would be given to a legislative repeal or amendment; that is to say, make it prospective but not retroactive." (*Vide* 21 C. J. S., Courts, § 194, subd. b.)

This same language, without quotation marks, is found in *People ex rel. Rice* v. *Graves* (242 App. Div. 128, 133, affd. 270 N. Y. 498, certiorari denied 298 U. S. 683). At page 134 it is further said: " Contract rights cannot be impaired by a subsequent court decision altering the construction of a law. In *Woodruff* v. *Woodruff* (52 N. Y. 53) the court said: ' The counsel for the appellant is quite correct in saying that a decision of a court overruling a prior decision is a legal adjudication that the prior decision was not the law at the time it was made, although there may be rights of a contract acquired under the first which the last decision will not affect.' "

In support of these principles Ruling Case Law (Vol. 7, Courts, § 36) cites the following decisions of the United States Supreme Court: *Gelpcke* v. *City of Dubuque* (1 Wall. [U. S.] 175), *Ohio Life Insurance and Trust Company* v. *Debolt* (16 How. [U. S.] 416), *Havemeyer* v. *Iowa County* (3 Wall. [U. S.] 294), *Olcott* v. *The Supervisors* (16 Wall. [U. S.] 678), *Douglass* v. *County of*

*Pike* (101 U. S. 677), *Taylor* v. *Ypsilanti* (105 U. S. 60) and *Anderson* v. *Santa Anna* (116 U. S. 356). These cases are fully discussed by Professor Orvill C. Snyder in his article " Retrospective Operation of Overruling Decisions " (35 Ill. L. Rev., pp. 121, 153). A discussion of the legal philosophy involved in the effect of an overruling decision is also found in the opinion of CARDOZO, J., in *Gt. Northern Ry. Co.* v. *Sunburst Co.* (287 U. S. 358; Note, 85 A. L. R. 262, 265) and in *People ex rel. Rice* v. *Graves* (242 App. Div. 128, 130, 135, *supra*).

The United States Supreme Court decisions cited in support of these principles relate to State Constitutions and statutes. The reasoning used is applicable to a changed interpretation of our national Constitution. But did the Supreme Court on June 5, 1944, overrule any prior decision limiting the scope of the commerce clause?

Mr. Justice BLACK in the *Underwriters Assn.* case (322 U. S. 533, 553, *supra*) said: " No commercial enterprise of any kind which conducts its activities across state lines has been held to be wholly beyond the regulatory power of Congress under the Commerce Clause. We cannot make an exception of the business of insurance." He admitted, however, that the court since 1869 had repeatedly declared that insurance is not commerce but he then said (p. 544): " In all cases in which the Court has relied upon the proposition that ' the business of insurance is not commerce,' its attention was focused on the validity of state statutes — the extent to which the Commerce Clause automatically deprived states of the power to regulate the insurance business. Since Congress had at no time attempted to control the insurance business, invalidation of the state statutes would practically have been equivalent to granting insurance companies engaged in interstate activities a blanket license to operate without legal restraint."

Mr. Justice FRANKFURTER dissented in the *Underwriters Assn.* case (*supra,* p. 583) but, in delivering the opinion of the court in the *Polish Alliance* case (322 U. S. 643, 649, *supra*), he said: " The long series of insurance cases that have come to this Court for more than seventy-five years * * * have invariably involved some exercise of state power resisted, in most instances, on the claim that it was impliedly forbidden by the Commerce Clause. Such was the context in which this Court decided again and again that the making of a contract of insurance is not interstate commerce and that, since the business of insurance is in effect merely a congeries of contracts, the States may, for taxing and divers other purposes, regulate the

making of such contracts and the insurance business free from the limitations imposed upon state action by the Commerce Clause.''

An examination of the opinions in the insurance cases prior to June 5, 1944, reveals that the Supreme Court did not say that Congress had not yet regulated insurance business under the commerce clause and did not attempt to draw a line between the power of Congress and the States in regulating such business but that the court declared, without reservation, that the business of insurance is not commerce.

Mr. Chief Justice STONE, in his dissenting opinion in the *Underwriters Assn.* case (*supra*, p. 567), said: '' Our decisions on this subject have uniformly rested on the ground that the formation of an insurance contract, even though it insures against risk of loss to property located in other states or moving in interstate commerce, is not interstate commerce, and that although the incidents of interstate communication and transportation which often attend the formation and performance of an insurance contract are interstate commerce, they do not serve to render the business of insurance itself interstate commerce.''

Mr. Justice FRANKFURTER, in the *Polish Alliance* case (*supra*, p. 649), admitted that in most instances the insurance companies resisted the exercise of State power '' on the claim that it was impliedly forbidden by the Commerce Clause ''. While the Supreme Court did not decide expressly that Congress could not regulate insurance business under the commerce clause, it did so by implication when it considered the clause and declared that such business is not commerce. Mr. Chief Justice STONE, in his dissenting opinion in the *Underwriters Assn.* case (*supra*, p. 583), objected to the action of the Court '' in now overturning the precedents of seventy-five years governing a business of such volume and of such wide ramifications ''.

'' It cannot be said that a case is not authority on one point because, although that point was properly presented and decided in the regular course of the consideration of the cause, something else was found in the end which disposed of the whole matter. Here the precise question was properly presented, fully argued, and elaborately considered in the opinion. The decision on this question was as much a part of the judgment of the court as was that on any other of the several matters on which the case as a whole depended.'' (*Railroad Companies* v. *Schutte*, 103 U. S. 118, 143.)

Quoting this language with approval in *Union Pacific Co.* v. *Mason City Co.* (199 U. S. 160, 166) the Supreme Court said: " Whenever a question fairly arises in the course of a trial, and there is a distinct decision of that question, the ruling of the court in respect thereto can, in no just sense, be called mere dictum."

"The rule as to what does not constitute a dictum is that a decision of a legal proposition within the issues of the case, presented and argued by counsel to the court, * * * with its reasons therefor, decided, is not obiter, although the court could have determined the case on other propositions, but elected to settle that proposition." . (*Watson* v. *St. Louis, I. M. & S. Ry. Co.*, 169 F. 942, 945, affd. 223 U. S. 745; *vide Chicago B. & Q. R. Co.* v. *Board of Sup'rs.* 182 F. 291, 300; *Hawes* v. *Contra Costa Water Co.*, Fed. Cas. No. 6,235, affd. 104 U. S. 450; 15 C. J., Courts, § 344, pp. 952, 953.)

The statement of Mr. Justice BLACK that, in deciding the insurance cases (322 U. S. 533, 544, *supra*), the court's " attention was focused on the validity of state statutes " and the remarks of Mr. Justice FRANKFURTER about the " context " in which the court decided them, are pure obiter dicta (322 U. S. 643, 649, *supra*). The court could have frankly reversed its prior decisions as it has often done. It was not necessary to declare, expressly or by implication, that it did not reverse its prior insurance decisions or explain the psychology of the court in announcing that insurance is not commerce. The fact remains that " in most instances " the insurance companies have invoked the commerce clause, that the court considered it and made the unqualified declaration that insurance is not commerce. The result of this is clearly stated by Mr. Justice JACKSON (322 U. S. 533, 588, *supra*): " In contemplation of law, however, insurance has acquired an established doctrinal status not based on present day facts. For constitutional purposes a fiction has been established, and long acted upon by the Court, the states, and the Congress, that insurance is not commerce."

This " fiction " has found expression in many standard works on insurance law. For example, it is said in Couch's Cyclopedia of Insurance Law (1929 ed., Vol. 1, § 3): " Nor is insurance ' commerce ' within the meaning of a treaty between the United States and a foreign government providing for reciprocal liberty of commerce between the contracting countries, so as to give a foreign association or corporation the right to carry on an insurance business in the United States without complying with, or being subject to, local laws; nor within the

meaning of the Federal Constitution, even though the parties reside in different states."

"And insurance is not commerce or an instrumentality thereof, and a state may prescribe and enforce conditions, notwithstanding the constitutional provision as to interstate commerce." (1 Couch's Cyclopedia of Isurance Law [1929 ed.], § 245, p. 546.)

In Corpus Juris Secundum (Vol. 15, Commerce, § 22) it is said: "The business of insurance is not commerce, nor interstate commerce, even though the insurer and the insured are of different states, and this is true in the case of marine, fire and life insurance."

It therefore appears that the United States Supreme Court on June 5, 1944, reversed its prior decisions that insurance is not commerce.

In Corpus Juris (Vol. 15, §. 344, p. 953), it is further said: "Dicta, while not binding in themselves, may become finally a part of the recognized law of the land. Even though they have. not the merit of having regarded legal principles accurately, yet, having by frequent repetition and approval obtained a familiar place in the current decisions, they may ultimately be clothed with the same, or substantially the same, strength and importance attached to precedents. So where there is an accepted dictum of law which has long formed the basis of contracts, and upon the faith of which rights have vested, the courts will decline to overrule it."

Furthermore, Chancellor KENT, in *Lyon* v. *Richmond* (2 Johns. Ch. 51, 60 [1816]), said: "And to permit a subsequent judicial decision in any one given case, on a point of law, to open or annul every thing that has been done in other cases of the like kind, for years before, under a different understanding of the law, would lead to the most mischievous consequences. Fortunately for the peace and happiness of society, there is no such pernicious precedent to be found." This language is quoted with approval in *Newburgh Sav. Bank* v. *Town of Woodbury* (173 N. Y. 55, 61). In *Payne* v. *Witherbee, Sherman & Co.* (200 N. Y. 572, 576 [1911]) it is said: "The courts do not undertake to relieve parties of the results of their acts fairly done on a full knowledge of the facts, though under a mistake of the law."

The Fair Labor Standards Act of 1938 applies only to employees "engaged in commerce or in the production of goods for commerce" (Act, § 6, subd. [a]; U. S. Code, tit. 29, § 206, subd. [a]). The Federal Constitution gave Congress the power "To regulate Commerce with foreign Nations, and among the

several States, and with the Indian Tribes'' (art. I, § 8). Before plaintiff and defendant had entered into their contract, the United States Supreme Court had repeatedly declared that insurance is not commerce.

'' Contracts made on the faith of the law as enunciated in a decision of a court of last resort, in the absence of fraud, misrepresentation, or want of knowledge of all the facts, will not be set aside because of a subsequent decision by the same court overruling the former one.'' (13 C. J., Contracts, § 267; 17 C. J. S., Contracts, § 145.) '' The contract is to be interpreted in accordance with existing judicial decisions as to the law and not in accord with subsequent contrary decisions.'' (17 C. J. S., Contracts, § 330, p. 785.)

Plaintiff alleges that '' prior to and from October 24th, 1938 '' he was employed by defendant. The Fair Labor Standards Act of 1938 became effective on that date. If the contract in this case was made prior thereto, it became subject to the act if applicable (17 C. J. S., Contracts, § 330, p. 785; *Legal Tender Cases,* 12 Wall. [U. S.] 457; *Louisville & Nashville R. R.* v. *Mottley,* 219 U. S. 467; *Norman* v. *B. & O. R. Co.,* 294 U. S. 240 [gold clause case]) unless defendant is protected by some exception to the general rule as to the retrospective effect of judicial decisions.

Plaintiff alleges that he was employed by defendant '' at an average weekly wage of $37.50 per week '' and that he performed his duties '' with the knowledge, consent and approval of the defendant, and in said employer's interest.'' He does not allege that he was not paid the agreed wage. It appears that the contract of employment was fully executed and terminated on November 15, 1940, nearly four years before the decision in the *Underwriters Assn.* case (322 U. S. 533, *supra*). No fraud, duress, misrepresentation or want of knowledge of all the facts is alleged. Ordinarily, under these circumstances, defendant's obligation to plaintiff would end with the payment of the agreed wage. (17 C. J. S., Contracts, § 393; Restatement, Contracts, § 386.) Blackstone says that '' a contract *executed* (which differs nothing from a grant) conveys a *chose in possession* '' (2 Blackstone's Comm. 443).

On the principles of law herein stated, it would seem that defendant's motion ought to be granted. However, *Seneca Coal & Coke Co.* v. *Lofton* (136 F. 2d 359, 361, certiorari denied 320 U. S. 772) casts doubt on this conclusion. In that case plaintiff, who had been employed as a night watchman at a strip coal mine owned by defendant, recovered overtime compensation,

liquidated damages and an attorney's fee under the Fair Labor Standards Act of 1938. On April 27, 1940, he was paid $161.67 in full payment for any overtime due him and "accepted the same without comment or protest." The employer appealed from the judgment and contended that vested rights under the employment contract had accrued under the settled law as announced in *Carter* v. *Carter Coal Co.* (298 U. S. 238) which denied the power of the Federal Government to establish minimum wages and maximum hours for the type of employment involved in this case. Appellant further contended that the parties relied on this state of the law when the contract was made and performed (p. 363) " * * * hence the appellant cannot be divested of this right by the subsequent change in the underlying constitutional principles upon which the contract is based."

The Circuit Court of Appeals, affirming the judgment, said (pp. 363–364): " Whatever may be the limits of the doctrine of stare decisis, or the rule which protects vested rights acquired upon the faith of a rule or decision, see Jackson v. Harris, 10 Cir., 43 F. 2d. 515, 516, the application of this rule cannot aid the appellant. The Carter Coal case decided the constitutionality of the Bituminous Coal Conservation Act of 1935, 49 Stat. 991, but it did not decide the constitutionality of the Fair Labor Standards Act, which had not been enacted at that time. In passing on this question, the court doubtless used language which encouraged the appellant to conclude that it was not within the constitutional power of the Federal Government to regulate its labor relations. However appellant was not warranted in concluding that the Fair Labor Standards Act was unconstitutional or inapplicable to the employment involved, merely because the Supreme Court had nullified a wholly different Congressional enactment relating to somewhat the same subject matter, and having common purposes. We hold that the employer violated the provisions of Sections 6 and 7 of the Fair Labor Standards Act, and it is therefore liable for liquidated damages as computed and awarded by the trial court."

The Court further said (p. 363): " The violation was committed in good faith based upon a mistake of law. It was nevertheless a valid obligation, created by the applicable law, and failure to discharge it in accordance therewith constituted a violation of Sections 6 and 7 of the Act."

*Jackson* v. *Harris* (43 F. 2d 513, 516) cited by the court and by defendant's counsel in the case at bar, but not followed, involved a question of the law of descent of Indians in Okla-

homa. In the opinion it is said: " There is a well settled excep-tion to this general rule [retrospective operation of overruling decision] that, where contracts have been entered into or rights acquired upon the faith of a decision, they cannot be impaired by a change of construction made by a subsequent decision." (Many United States Supreme Court decisions are cited.)

The *Lofton* case (136 F. 2d 359, *supra*) indicates the trend of judicial decisions interpreting the Fair Labor Standards Act of 1938 and in my opinion would have the approval of the United States Supreme Court, which denied certiorari (320 U. S. 772). As was said by the Circuit Court of Appeals in the recent decision in *Fleming* v. *Post* (146 F. 2d 441) " * * * we feel that the decisions of the Supreme Court indicate such a result, and we must follow what seem to us the implications of these decisions; ' we are merely a reflector, serving as a judicial moon ' (Choate v. Commissioner, 2 Cir., 129 F. 2d 684, 686)."

With great reluctance, therefore, this court feels obliged to deny defendant's motion. An order may be entered denying defendant's motion to dismiss the complaint under rule 106 of the Rules of Civil Practice, with motion costs.