DARR et al. v. MUTUAL LIFE INS. CO. OF NEW YORK.

Civ. No. 35466.

District Court, S. D. New York.

April 30, 1947.

Stanley Faulkner, of New York City (Raymond S. Harris, of New York City, on the brief), for plaintiffs.

Louis W. Dawson, of New York City (Joseph V. Lane, Jr., of New York City, of counsel), for defendant.

HINCKS, District Judge.

This cause coming on to be heard before the undersigned sitting in said court as a Judge of Law and Fact, a jury having been waived, and it being stipulated between the parties hereto that the decision to be made herein shall be predicated upon special findings of fact which the court is requested to make, the court, upon consideration of the competent evidence herein and of the stipulation of the parties hereto, does find the facts to be as follows, to wit:

### Findings of Fact

1. The defendant is a New York corporation engaged in the business of life insurance and having its principal place of business at 34 Nassau Street, in the Borough of Manhattan, City of New York, where it owns and occupies as its home office contiguous buildings known as 34 Nassau Street, 32 Liberty Street, 26 Liberty Street, 55 Cedar Street, 47 Cedar Street and 43 Cedar Street. These buildings are connected on certain floors by hallways. Each building has its own separate set or tier of elevators.

2. The gross rentable area of said buildings is approximately 365,000 square feet. Of this, for purposes of its insurance business the defendant occupies approximately 76%, or 275,000 square feet, and approximately 24%, or 86,000 square feet, is rented out to other tenants, of whose business there is no evidence in this case.

3. The defendant plans, directs and controls its insurance business from its home office as aforesaid and carries it out through agencies which it has established in all the states of the Union except Texas. As an integral part of said business the defendant enters into and performs a multitude of contracts of life insurance and the steps usually taken in the consummation of such contracts are as follows:

(a) An application is filled out by the proposed insured with the help of an agent in the field who provides a printed form therefor received from the home office. The application is returned to the branch office in that territory and a form of medical report is sent to the doctor who is to examine the prospect. The medical report is filled out and signed by the doctor and sent to the branch office.

(b) The application form and medical form are then sent by the branch office to the home office.

(c) At the home office the application form and medical form are channeled to the Selection Department where underwriters read the contained information and determine whether the particular application is acceptable under the rules of the Company.

(d) If the risk is accepted the papers pass on to the Division of Policy Issue where the necessary information is typed on a previously prepared form called a policy form.

(e) The application is photostated.

(f) The policy form and the photostat are checked and if in order are mailed back to the branch office with an "initial-premium-paid" form.

(g) At the branch office the policy is delivered to the underwriter or agent who takes it to the insured and gets from the insured the premium or stated amount called for in the policy. Until the stated amount is paid, the policy is not delivered.

(h) If the premium is paid the agent brings the check to the branch office. The branch office stamps the initial-premium-paid form.

However, sometimes the initial premium is paid in advance and check therefor accompanies the application blank. The comparative volume of such business is not shown.

4. None of the policy forms or other forms used in the defendant's business are printed by the defendant or by any companies in which it has a financial interest. Approximately 10% to 20% of all application forms which are sent out to the various branch offices are returned to the home office for approval and the issuance of a policy form.

5. The applications are photostated on the sixth floor in 34 Nassau Street in an area having approximately 1,109 square feet. (See Par. 3(e) above).

6. The printed policy forms are filled in by nine typists who occupy an area approximately 816 square feet in 34 Nassau Street (See Par. 3(d) above).

7. The plaintiff, R. Martin, is an elevator starter. The plaintiff, J. B. Martin, is an assistant janitor. The remaining plaintiffs are or were elevator operators who were employed by the defendant during all or part of the time mentioned in the complaint.

8. Plaintiffs J. B. Martin and J. Uliano, but none of the other plaintiffs, were employed in the building known as 34 Nassau Street.

9. Subsequent to December 5, 1940, the plaintiffs were paid at regular rates for the first 40 hours worked weekly and at one and one-half times the regular rate for time worked in excess of 40 hours weekly except that plaintiffs neither prior nor subsequent to December 5, 1940 were paid for the time included in the morning and afternoon rest periods prevailing in the respective buildings, as follows:

| Building | Morning | Afternoon |
|---|---|---|
| 1. 34 Nassau Street | 45 min. | 45 min. |
| 2. 32 Liberty Street | 40 " | 40–45 Min. |
| 3. 26 Liberty Street | 25 " | 25 Min. |
| 4. 55 Cedar Street | 45 " | 45 " |
| 5. 47 Cedar Street | 25 " | 30 " |
| 6. 43 Cedar Street | 30 " | 30 " |

The buildings in which all of the plaintiffs except J. B. Martin spent most of their working time were as follows:

| Name | Buildings |
|---|---|
| J. Dudasik | 3 – 4 – 6 |
| T. Faragher | 2 |
| K. Jacobsen | 2 – 3 – 4 |
| H. Jacobson | 2 – 3 – 4 |
| A. Luttecke | 2 |
| R. Martin | 2 |
| C. Newberg | 4 |
| J. Strakol | 3 – 4 |
| J. Mohlman | 3 |
| T. Darr | 3 – 5 |
| N. Gannon | 4 |
| J. Graham | 2 – 3 |
| A. Taylor | 4 |
| J. Uliano | Utility man, worked in all shafts. |

Under the plaintiffs' contract of employment, neither they nor the defendant ever contemplated that compensation would be paid for said rest periods.

10. During these rest periods, throughout the time covered by the complaint and prior thereto, the time of the plaintiffs was their own just as fully as their lunch periods for which they never have been compensated, and they were free to leave the defendant's premises or to rest in a locker-room maintained for their comfort and convenience by the defendant on the premises.

11. The following table shows for the 28 weeks between April 12, 1940 and October 28, 1940 (when the statutory premium for overtime covered all time worked in excess of 42 hours weekly) and the six weeks

between October 29, 1940 and December 6, 1940 (when the statutory premium for overtime covered all time worked in excess of 40 hours weekly), the total overtime worked by each plaintiff (who worked overtime in that period) and the entire overtime earned by each if, as I hold, the Fair Labor Standards Act was applicable.

| Name | Total Overtime in Hours | Overtime Premium Earned |
|---|---|---|
| John Dudasik | 216 | $ 67.50 |
| Thomas Faragher | 216 | 67.50 |
| K. A. Jacobsen | 216 | 67.50 |
| Harry Jacobson | 216 | 67.50 |
| Adolph Luttecke | 216 | 67.50 |
| Jos. B. Martin | 168 | 52.50 |
| Robert Martin | 216 | 67.50 |
| John Mohlman | 216 | 67.50 |
| Carl Newberg | 216 | 67.50 |
| John Strokol | 216 | 67.50 |
| Theodore Darr | 0 | .00 |
| Neil Cannon | 0 | .00 |
| James Graham | 0 | .00 |
| Arthur Taylor | 0 | .00 |
| Jerry J. Uliano | 0 | .00 |
| Aggregate Premiums earned, | | $660.00 |

12. The premiums shown above as earned were not paid: the terms of employment did not provide for such payments and the parties did not understand that the employment was covered by the Act.

13. All overtime premiums required by the Act which were earned subsequent to December 5, 1940 were fully paid when due.

### Conclusions of Law

■ 1. The life insurance policies issued by the defendant are "goods" within the meaning of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq.

■ "Goods" is expressly defined by Sec. 3 of the Act to cover "articles or subjects of commerce." As such, it comprehends the intangible as well as the tangible and includes telegraph messages, Western Union Tel. Co. v. Lenroot, 323 U.S. 490, 65 S.Ct. 335, 89 L.Ed. 414; stocks and bonds, Bozant v. Bank of New York, 2 Cir., 156 F.2d 787; and even written advertising matter, Baldwin v. Emigrant Industrial Savings Bank, 2 Cir., 150 F.2d 524, 161 A.L.R. 1234. This conclusion extends to policies paid in advance which when they leave the home office already constitute binding contracts as well as to those which become effective not until subsequent delivery in the field contemporaneously with the collection of the first premium. The fact that the defendant might be deemed to have reserved title to the latter class of policies during their interstate transmission is without significance for present purposes. Associated Press v. National Labor Relations Board, 301 U.S. 103, 129, 57 S.Ct. 650, 81 L.Ed. 953.

■ 2. The defendant's activities in the development of the content of its insurance contracts and the preparation of its policy forms constitute the "production" of goods within Secs. 6 and 7 of the Act.

Sec. 3 of the Act defines production as follows: "(j) 'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this chapter an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any State."

Of this, in Western Union Tel. Co. v. Lenroot, 323 U.S. 490, 65 S.Ct. 335, 342, 89 L.Ed. 414, it was said: "We are clear that 'handled' or 'worked on' includes every kind of incidental operation preparatory to putting goods into the stream of commerce." Under this sweeping dictum the task of the actuaries, the executives and the lawyers in formulating and giving expression to the substance of insurance policies, just as fully as the duties of the employees mentioned in Paragraph 3 of the findings, constitute production. Borden Co. v. Borella, 325 U.S. 679, at page 683, 65 S.Ct. 1223, 89 L.Ed. 1865, 161 A.L.R. 1258.

■ 3. At least those policies which cover and are delivered to insured persons in other states, are goods produced "for

(interstate) commerce" within the meaning of the act.

■ Even though the consummation of an insurance policy issued by the defendant "considered as a thing apart from negotiation and execution, does not itself constitute interstate commerce", the defendant's practice in issuing such policies for delivery in other states constitutes an integral part of an interstate business, United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440. Polish Nat. Alliance v. National Labor Relations Board, 322 U.S. 643, 64 S. Ct. 1196, 88 L.Ed. 1509. As was observed in the Underwriters' case "a nationwide business is not deprived of its interstate character merely because it is built upon sales contracts which are local in nature." 322 U.S. at page 547, 64 S.Ct. at page 1170, 88 L.Ed. 1440. See also Polish Nat. Alliance v. National Labor Relations Board, supra, 322 U.S. at page 648, 64 S.Ct. 1196, 88 L.Ed. 1509. It follows, I think, that the defendant must be deemed as a regularly recurrent and substantial part of its business to issue its policies "for (interstate) commerce." Cf. Mabee v. White Plains Publishing Co., 327 U.S. 178, 66 S.Ct. 511, 90 L.Ed. 607. This conclusion includes both the prepaid policies which become effective upon acceptance in the home office and those which become effective only on delivery in the field contemporaneously with the collection of the first premium.

■ 4. The plaintiffs were not themselves "engaged in [interstate] commerce" within the meaning of sections 6 and 7 of the Act. McLeod v. Threlkeld, 319 U.S. 491, 63 S.Ct. 1248, 87 L.Ed. 1538; Phillips v. Star Overall Co., 2 Cir., 149 F.2d 416.

5. The plaintiffs, as service and maintenance personnel, were engaged in the production of goods for commerce within the meaning of the Act.

It was so held in Borden v. Borella, and in the Bank of New York and Emigrant Savings Bank cases, supra. See also Kirschbaum v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638.

■ 6. The plaintiffs were not entitled to compensation for the time spent in the rest periods described in Findings, Paragraphs 9 and 10.

■ Section 203-a of the Labor Law of the State of New York, Consol.Laws, c. 31, is not to the contrary. This requires only that "passenger elevator operated and maintained for use by the public shall be equipped or furnished with a seat, collapsible or otherwise, for the use of the operator when the elevator is not being operated, provided the operator thereof is not allowed a continuous recess period of at least fifteen minutes in every three hours in addition to and apart from a lunch period of at least forty-five minutes." Plainly this is a safety regulation. Neither in words nor by implication does it require that employees shall be compensated for "recess periods" during which their time was their own.

■ Under the Fair Labor Standards Act I hold that for their rest periods no more than for their lunch periods were the plaintiffs entitled to compensation. The press release of the Administrator of the Wage and Hour Division in evidence, though of questionable competence as a statement of the applicable law, is not to the contrary. It provides only that the Administrator of the Wage and Hour Division shall determine whether rest periods exceeding 20 minutes are compensable and that in making that decision he shall be guided, inter alia, by the freedom of the employee to leave the premises. There was no evidence of official ruling by the Administrator to the effect that these plaintiffs were entitled to compensation for their rest periods.

7. The plaintiffs named in Paragraph 11 of the Findings are each entitled to recover of the defendant twice the amount of overtime premium found due in said paragraph, and a reasonable attorney fee.

Plaintiffs' counsel may file a petition for allowance of attorney's fee supported by a verified statement of the services rendered, and, if desired, by written argument. Defendant's counsel may thereafter have one week for written reply. Thereafter upon entry of an order fixing the attorney's fee, the Clerk will enter judgment accordingly.