**GLEN MANOR HOME FOR the JEWISH AGED, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 72–1537.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 5, 1972.

Decided Feb. 22, 1973.

---

J. Mack Swigert, Taft, Stettinius & Hollister, Cincinnati, Ohio, for petitioner.

Frank Vogl, N.L.R.B., Washington, D. C., for respondent; Peter G. Nash, Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Elliott Moore, Deputy Asst. Gen. Counsel, Frank Vogl, Atty., N.L.R.B., Washington, D. C., John C. Getreu, Director Region 9, N.L.R.B., Cincinnati, Ohio, on brief.

Before PHILLIPS, Chief Judge, PECK, Circuit Judge, and O'SULLIVAN, Senior Circuit Judge.

PHILLIPS, Chief Judge.

The Glen Manor Home for the Jewish Aged brings this petition to review and set aside a National Labor Relations Board order and decision finding it in violation of §§ 8(a)(1) and 8(a)(5) of the National Labor Relations Act. 196 N.L.R.B. 171.

The Home is a non-profit institution located in Cincinnati and is licensed by the city as a nursing home and as a rest home. It maintains constant health services for its approximately 80 residents. A physician is on call at all times and is present at the Home three times weekly. Constant nursing care is administered by a staff of four registered nurses, three graduate licensed practical nurses (GLPN's) and ten nurses' aides. When residents become ill, the Home attempts to care for them as long as possible, but when they reach the critical stage they are discharged to a hospital or a private nursing home. The Home has no major medical facilities. All services necessary for residents are provided, including food preparation, laundry services, housekeeping and maintenance. Average length of residence at the Home is three and one-half years.

In 1970 the gross revenue of the Home was $342,039. Approximately $60,000 of this came from the State-administered federal-state Medicaid program. During 1970, the Home paid $18,000 to the Cincinnati Gas & Electric Company, $2,400 to Cincinnati Bell Telephone and $20,000 to Shillito's department store, all of which are engaged in interstate commerce.

On July 12, 1971, the National Union of Hospital and Nursing Home Employees, Local 1099 H, Retail, Wholesale & Department Store Union, AFL–CIO, filed a representatión petition and requested an election be held among the Home's service and maintenance employees. On September 2, the Regional Director issued his decision and direction of election after finding that the Home was subject to Board jurisdiction as a nursing home under the standards of University Nursing Home, Inc., 168 N.L.R.B. 263 (1967). This decision included two of the GLPN's in the bargaining unit and excluded the third. The Board denied the Home's petition for a review, determining that the two GLPN's included in the unit should be permitted to vote in the representation election subject to the challenge procedure. It should be noted that throughout the representation proceedings the Home disputed the Board's asserted jurisdiction over it.

The representation election was conducted on October 1, 1971, with the Union winning, 19–15. The Union was certified as the unit's collective bargaining agent, after which the Home refused to bargain with it. The Union thereupon filed a complaint against the Home alleging violations of §§ 8(a)(1) and 8(a)(5). The defense of the Home in the unfair labor practice proceedings was the alleged impropriety of the bargaining unit. The Board, on May 22, 1972, found that the refusal to bargain was an unfair labor practice and violated §§ 8(a)(1) and 8(a)(5) of the Act.

The Board held that the improper unit claim of the Home concerning the GLPN's was not a valid defense to the unfair labor practice charge because there was no doubt as to the majority status of the union. The Board suggested bargaining over the unit placement of the GLPN's or, failing at that, a petition for unit clarification.

The Home now seeks review of the order and decision of the Board on two grounds: 1) the Board improperly asserted jurisdiction over it, and 2) the unit outlined by the Board in the representational proceedings was improper. We examine the issues in order.

### 1) Jurisdiction

■ It is well established that Congress, in passing the National Labor Relations Act, gave and intended to give the Board the fullest permissible jurisdiction under the Commerce Clause of the Constitution. N.L.R.B. v. Reliance Fuel Oil Corp., 371 U.S. 224, 226, 83 S. Ct. 312, 9 L.Ed.2d 279 (1963); Polish National Alliance v. N.L.R.B., 322 U.S. 643, 647, 64 S.Ct. 1196, 88 L.Ed. 1509 (1944). The statutory jurisdiction of the Board extends to all representation questions and unfair labor practices "affecting commerce." 29 U.S.C. §§ 159(c)(1), 160(a).

Because of several factors, including limited resources and manpower, the Board for the first fifteen years of its existence determined on an ad hoc case-by-case method whether to assume jurisdiction in a particular case. This was replaced in 1950 with the pronouncement of a series of "yardsticks" to determine whether the Board would assume jurisdiction in a specific type of case. These standards, issued in a series of 1950 decisions by the Board, were essentially dollar volumes. The Board held that if these dollar volume minimums of the value of inflow or outflow were exceeded in a particular case then it would take jurisdiction. In other cases it would decline to act. Different yardsticks were promulgated for different industries. The yardsticks were raised in 1954 and then lowered in 1958. *See* Siemons Mailing Service, 122 N.L.R.B. 81 (1958). In 1959, Congress validated this Board practice, extending over a span of 20 years, of declining jurisdiction in certain cases, by the enactment of § 14(c)(1) of the Act. 29 U.S.C. § 164(c)(1). This amendment authorizes the Board to decline jurisdiction by "rule of decision or by published rules."

There is no statutory jurisdiction over non-profit hospitals. 29 U.S.C. § 152(2). The Board originally exercised no jurisdiction over proprietary hospitals, either, Flatbush General Hospital, 126 N.L.R.B. 144 (1960), but asserted jurisdiction over them in 1967. Butte Medical Properties, 168 N.L.R.B. 266 (1967). On the same day, the Board asserted jurisdiction for the first time over proprietary nursing homes, University Nursing Home, 168 N.L.R.B. 263 (1967), and announced a gross volume of business yardstick of $100,000. The Board, in that decision, found that there were over 20,000 public and private nursing homes in the country at that time, caring for from one to two per cent of the nation's population. By 1965, the annual gross national expenditure for nursing home care was $1.2 billion, up 754 per cent from the 1950 expenditure of $142 million.

The Board did not exercise jurisdiction over non-profit nursing homes until, in 1968, a District Court held that the Board could not constitutionally assert jurisdiction over proprietary nursing homes while renouncing jurisdiction over non-profit nursing homes. Council 19, AFSCME v. N.L.R.B., 296 F.Supp. 1100 (N.D.Ill.). That court held that once the Board exerted jurisdiction over a class of employers (nursing homes), as it had in University Nursing Home, *supra*, it could not renounce jurisdiction over an entire category of employers within that class (non-profit nursing homes). Soon afterwards, in the same case, the Board asserted jurisdiction over non-profit nursing homes. Drexel Home, Inc., 182 N.L.R.B. 1045 (1970). The Board found, in *Drexel*, that the non-profit nursing home exercises the same kind of impact on interstate commerce as a proprietary nursing home. The Board adopted the same $100,000 yardstick for non-profit nursing homes as it had previously adopted for proprietary homes.

The Home here makes three separate attacks on the jurisdiction of the Board. First, it maintains that *Drexel*, under whose authority the Board assumed jurisdiction of this case, is an impermissible assertion of jurisdiction by the Board; second, it asserts that the $100,000 yardstick is arbitrary and capricious; and third, it claims that it is not a nursing home within the meaning of the *Drexel* rule.

■ The Board's contention that the Home should be barred from making its jurisdictional claims on appeal is ill-founded. The Home maintained a continuing jurisdictional objection in the representation proceedings and was barred from making these claims in the unfair labor practice proceedings before the Board in the absence of newly found evidence. N.L.R.B. Rule No. 102.67(f); Howard Johnson Co., 164 N.L.R.B. 801 (1967); *Cf.* May Dept. Stores Co. v. N. L.R.B., 326 U.S. 376, 379, 66 S.Ct. 203, 90 L.Ed. 145 (1945.) It appears that the exact nature of the jurisdictional objection may be different in this Court from the specific objection before the Board. This is not, however, controlling.

■■ This court has held that the exercise of jurisdiction by the Board is within the administrative discretion of the Board and will not be reversed without demonstration of an abuse of that discretion. Lucas County Farm Bureau Cooperative Ass'n v. N.L.R.B., 289 F.2d 844, 845–846 (6th Cir.), cert. denied, 368 U.S. 823, 82 S.Ct. 42, 7 L.Ed.2d 28 (1961); N.L.R.B. v. Guernsey-Muskingum Electric Co-Op, 285 F.2d 8, 11 (6th Cir. 1960). We have held further that the Board's assertion of jurisdiction in violation of its own self-imposed yardstick is not improper. N.L.R.B. v. West Side Carpet Cleaning Co., 329 F.2d 758, 760 (6th Cir. 1964).

We cannot hold that the Board's decision to assert jurisdiction over non-profit nursing homes was an abuse of discretion. The Home seeks to have this court impose an analogy between non-profit hospitals, which are statutorily exempt from Board jurisdiction, and non-profit nursing homes. Assuming, without deciding, that such an analogy would have been permissible, we decline to mandate it to the Board. The Board apparently has decided instead that there is a closer analogy between non-profit and proprietary nursing homes.

The Home has delineated ample evidence in the legislative history of the Labor Management Relations Act that the Senate committee did not originally exclude hospitals from N.L.R.B. jurisdiction in the preliminary draft of what became § 2(2) of the Act because, in the words of Senator Taft, "the Committee felt that hospitals were not engaged in interstate commerce and . . . their business should not be so construed." 2 Legislative History of the Labor Management Relations Act (1947) at 1464. While this may well be true, § 2(2) as enacted does not exclude non-profit employers generally. Only non-profit hospitals are exempted from the class of employers subject to the provisions of the Act and the jurisdiction of the N. L. R. B. 29 U.S.C. § 152(2).

■ Conditions in the health care industry have changed substantially since 1947. The Board, in the Universal Nursing Home decision in 1967, noted that there was a 754 per cent increase in nursing home care expenditures between 1950 and 1965. 168 N.L.R.B. at 264. This data now is over seven years old. The assertion of jurisdiction by the Board over the non-profit nursing homes cannot be viewed as an abuse of the Board's discretion, in light of the nursing home industry's impact on the economic life of this country.

■ As far as the $100,000 yardstick is concerned, we hold that this was also a permissible standard within the Board's discretion. We reemphasize that the Board's permissible jurisdiction is as broad as the Commerce Clause.

■■ The Home seeks to have this court hold that it really is not a nursing home within the *Drexel* rule. This same contention was made by the home for the aged in *Drexel* itself. This is a fact determination within the jurisdiction of the Board and its determination is entitled to great weight. We find no abuse of discretion. The Board's decision that Glen Manor was an industry "affecting commerce" similarly was not an abuse of discretion.

We hold that the Board's assertion of jurisdiction over non-profit nursing homes generally and the Glen Manor Home for the Jewish Aged in particular was not improper.

### 2) Unit Determination

The Home has claimed, before the Board and this court, that there was an improper unit determination made by the Board in including two of the GLPN's in the bargaining unit. The Home claims that these two employees are supervisors. A search of the record reveals that the Regional Director in his decision in the representation case did hold to this effect. The Board, however, in its actions in both the representation case and the unfair labor practice proceeding, has not ruled on the propriety of the inclusion of these two GLPN's within the unit. Instead it has suggested arbitration or bargaining or a petition for unit clarification, which is available to either party. 29 CFR § 102.60(b). It should be noted that their inclusion or exclusion will not affect the Union's majority status within the unit because of the 19–15 vote in the representation election. We, therefore, make no ruling on their status.

We deny the petition of the Home and grant the Board's cross application to enforce its order.