## WALLING v. AMIDON.

### No. 3179.

Circuit Court of Appeals, Tenth Circuit.

Jan. 10, 1946.

Faye Blackburn, Atty., U. S. Dept. of Labor, of Washington, D. C. (William S. Tyson, Acting Solicitor, and Bessie Margolin, Asst. Solicitor, both of Washington, D. C., Reid Williams, Regional Atty., of Kansas City, Mo., and David O. Walter, Atty., U. S. Dept. of Labor, of Washington, D. C., on the brief), for appellant.

William T. Burris, of Pueblo, Colo. (Mc-Hendrie, Burris & Pointer, of Pueblo, Colo., on the brief), for appellee.

Before PHILLIPS, BRATTON, and HUXMAN, Circuit Judges.

PHILLIPS, Circuit Judge.

Walling, as Administrator, has appealed from a judgment denying his application for an injunction to restrain Amidon from violating the overtime provisions of the Fair Labor Standards Act of 1938, 52 Stat. 1060, 29 U.S.C.A. § 201 et seq.[1]

Amidon is engaged at Pueblo, Colorado, in the production, sale, and distribution of sand and gravel. He owns and operates a sand and gravel screening and mixing plant on the Fountain River at Pueblo, Colorado. He also produces fine sand from a hillside pit.

The Colorado Fuel and Iron Corporation[2] owns and operates a large steel mill near Pueblo in which it produces iron and steel. From such iron and steel it manufactures railroad rails, construction beams, castings, wire, and numerous other iron and steel commodities. These commodities are shipped in interstate commerce to all parts of the United States.

Amidon mixes the fine sand with sand from the river bed according to established specifications of the Colorado Corporation to produce cast shed sand. The mixing or blending is done at Amidon's screening plant. Sand is carried to the plant by truck from the hillside pit and by cable-way from the river bed.

For several years prior to the filing of the complaint herein, the Colorado Corporation had made contracts with Amidon to supply it annually with all of its cast shed sand. Under the contracts, Amidon delivered the cast shed sand to a stockpile of the Colorado Corporation on the latter's premises. The Colorado Corporation paid for the sand as and when delivered.

The troughs which carry the molten metal and slag from the blast furnaces are lined with cast shed sand to protect such troughs from the intense heat of the molten metal and to prevent the molten metal from sticking to the troughs and thus interfering with its free flow through such troughs. Cast shed sand or some substitute therefor must be used at such stage in the process of the manufacture of iron and steel products. The heat of the molten metal converts the cast shed sand in the troughs into slag. This requires the sand to be replaced in the troughs at frequent intervals.

Amidon also furnishes the Colorado Corporation with core and molding sand directly from the hillside pit which is used by the Colorado Corporation in the molding of castings used solely in making repairs to its manufacturing equipment.

Amidon also produces other grades of sand such as brick, cement, plaster, and mortar mix sand.

Amidon's employees work interchangeably and irregularly at mining, excavating, screening, washing, sorting, mixing, and otherwise preparing the sand and gravel produced, and at loading, hauling, and unloading such sand and gravel. Amidon does not keep a separate record of the time devoted by his employees to the production of the several separate grades or kinds of sand and gravel produced. From April, 1943, to and including February, 1944, Amidon's sales to the Colorado Corporation amounted to $7,307.75, and to other persons to $534.90. During the last eight months of 1943, the sand purchased by the Colorado Corporation from Amidon was of the following dollar value: Brick and plaster sand, $466.26; river-run sand, $244.-65; cast shed sand, $5,074; core and bank sand, $424.05. During that eight-month period approximately all of the sand sold to the Colorado Corporation was cast shed sand and the sales to the Colorado Corporation were approximately 93 per cent of Amidon's sales.

The question presented is whether Amidon's employees are "engaged * * * in the production of goods for commerce" within the meaning of § 7(a) of the Act.

Section 3(j) of the Act defines "produced" as follows: "'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this Act an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any State."

---

[1] Hereinafter referred to as the Act.

[2] Hereinafter called the Colorado Corporation.

■ The word "necessary" in § 3(j) of the Act is not to be used in the highly restrictive sense of indispensable, essential, or vital. It must be harmonized with its context. The test is whether it is practically necessary, and, in borderline cases, the criterion is necessarily one of degree. [3]

"What is required is a practical judgment as to whether the particular employer actually operates the work as part of an integrated effort for the production of goods." [4]

Here, the cast shed sand is mixed in accordance with particular specifications furnished by the Colorado Corporation. The sand is not processed and does not become a part of the manufactured article but it is a necessary supplement to the equipment with which the manufacturing process is carried out and it or some substitute therefor is necessary in the production of the iron and steel products manufactured by the Colorado Corporation.

■ Congress, in enacting the Act, did not see fit, as it did in other regulatory measures, like the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., and the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., to exhaust its constitutional power over commerce. It manifested a purpose to leave local business to the protection of the states. [5] The Act puts upon courts the responsibility of applying its general terms to an infinite variety of complicated industrial situations. [6] "The test of whether one is in commerce is obviously more exacting than the test of whether his occupation is necessary to production for commerce." [7] Nevertheless, in construing the latter phrase, we must be careful not to absorb by adjudication essentially local activities that Congress did not see fit to embrace in the Act. [8]

"Merely because an occupation involves a function not indispensable to the production of goods, in the sense that it can be done without, does not exclude it from the scope of the" Act. "Conversely, merely because an occupation is indispensable, in the sense of being included in the long chain of causation which brings about so complicated a result as finished goods, does not bring it within the scope of the" Act. [9]

■ The fact that the employees in question are employed by Amidon and not by the Colorado Corporation is not controlling nor is it necessary that the employees themselves participate in the physical process of the making of the goods. [10] By the final clause of § 3(j), employees engaged "in any process or occupation necessary to the production" are included.

■ Here, Amidon's employees mine, mix, wash, and prepare a product which is a necessary supplement to the equipment with which the iron and steel products are produced. It is a supplement which must be replaced at frequent intervals. The work of such employees is intimately related to the actual physical process by which the goods are manufactured. Their work is tied so closely and immediately with the process of production of goods for commerce, and is so much a part of the integrated and coordinated productive efforts by which the goods are produced, that, under the adjudicated cases, such employees should be regarded as engaged in an "occupation 'necessary to the production'" of goods for commerce. [11]

The judgment is reversed and the cause is remanded with directions to proceed further in accordance with this opinion.

---

[3] Armour & Co. v. Wantock, 323 U. S. 126, 129, 130, 65 S.Ct. 165.

[4] Armour & Co. v. Wantock, 323 U. S. 126, 130, 65 S.Ct. 165, 167.

[5] 10 East 40th Street Bldg., Inc., v. Callus, 325 U.S. 578, 582, 65 S.Ct. 1227, 1229.

[6] 10 East 40th Street Bldg., Inc., v. Callus, 325 U.S. 578, 579, 580, 65 S.Ct. 1227, 1228.

[7] Armour & Co. v. Wantock, 323 U. S. 126, 131, 65 S.Ct. 165, 168.

[8] 10 East 40th Street Bldg., Inc., v. Callus, 325 U.S. 578, 582, 583, 65 S.Ct. 1227, 1229.

[9] 10 East 40th Street Bldg., Inc., v. Callus, 325 U.S. 578, 582, 65 S.Ct. 1227, 1229.

[10] Kirschbaum Co. v. Walling, 316 U. S. 517, 524, 525, 62 S.Ct. 1116, 86 L. Ed. 1638.

[11] See Kirschbaum Co. v. Walling, 316 U.S. 517, 525, 526, 62 S.Ct. 1116, 1121, 86 L.Ed. 1638; Warren-Bradshaw Drilling Co. v. Hall, 317 U.S. 88, 91, 63 S. Ct. 125, 87 L.Ed. 83; Armour & Co. v. Wantock, 323 U.S. 126, 130, 65 S.Ct. 165; Walton v. Southern Package Corp., 320 U.S. 540, 542, 64 S.Ct. 320, 88 L. Ed. 298; Walling v. Roland Electrical Co., 4 Cir., 146 F.2d 745, 747; Reynolds v. Salt River Valley Water Users Ass'n, 9 Cir., 143 F.2d 863, 867.