**E. C. SCHROEDER CO., Inc., v. CLIFTON et al.**

**CLIFTON et al. v. E. C. SCHROEDER CO., Inc.**

**Nos. 3176, 3178.**

Circuit Court of Appeals, Tenth Circuit.

Jan. 24, 1946.

Rehearing Denied Feb. 27, 1946.

PHILLIPS and HUXMAN, Circuit Judges, dissenting in part.

————————

Reuel W. Little, of Madill, Okl. (Jack H. Smith and Little & Smith, all of Madill, Okl., on the brief), for appellant and cross-appellee.

Louis A. Fischl, of Ardmore, Okl. (Thos. W. Champion, of Ardmore, Okl., on the brief), for appellees and cross-appellants.

Faye Blackburn, Atty., U. S. Department of Labor, of Washington, D. C. (William S. Tyson, Acting Solicitor, and Bessie Margolin, Assistant Solicitor, both of Washington, D. C., Earl Street, Regional Atty., of Dallas, Tex., and Joseph M. Stone, Atty., U. S. Department of Labor, of Washington, D. C., on the brief), for Administrator of Wage and Hour Division, U. S. Department of Labor, as amicus curiae.

Charles A. Horsky, of Washington, D. C. (Amy Ruth Mahin and Covington, Burling, Rublee, Acheson & Shorb, all of Washington, D. C., on the brief), for National Sand & Gravel Ass'n, as amicus curiae.

Before PHILLIPS, BRATTON and HUXMAN, Circuit Judges.

BRATTON, Circuit Judge.

M. L. Clifton, for himself and as agent for others, instituted this action against E. C. Schroeder Company to recover overtime compensation, liquidated damages, and attorney's fees pursuant to section 16(b) of the Fair Labor Standards Act, 52 Stat. 1060, 29 U.S.C.A. § 201 et seq. The overtime was (1) that of employees engaged at the quarry in mining, producing, and processing stone used for gravel cushion and riprap in the construction of relocated portions of a railroad and a highway, and (2) that of employees in rendering like service in connection with gravel cushion and riprap used in the construction of a dyke for the protection of oil wells from inundation and in hauling some of the rock from the quarry to the dyke. The question is whether employees engaged in work of that kind are within the coverage of the Act.

By the Act of June 28, 1938, 52 Stat. 1215, Congress authorized the construction of the Denison Dam and Reservoir on Red River for flood control and other purposes. It became apparent that water impounded by the completed dam would inundate a portion of the track of a railroad and a portion of a highway in Oklahoma, both arteries of interstate commerce. As a means of solving the problem, the United States entered into contracts with various contractors for the relocation of approximately 18.71 miles of trackage of the railroad and of approximately 3.8 miles of the highway. The relocated track has been connected with the existing track of the railroad company and has become a permanent part of it. The relocated portion of the highway when completed was or is to become a part of the existing highway but it had not been completed at the time of the trial of this case. The relocation sites for the track and the highway were upon raw, unimproved lands. It was necessary to survey, clear, grade, fill and excavate the sites. Piling was driven and concrete super-structures were erected. New road beds, one bridge for the relocated highway, and two for the relocated railroad track, were built. The plans and specifications called for the use of gravel cushion and riprap rock. The contractors acquired leases on property where approved rock and gravel could be produced, and they entered into contracts with the defendant in this case under which the defendant was to furnish all necessary machinery, equipment, labor, material, and other things necessary to produce and deliver the gravel cushion and riprap rock in the trucks of the contractors, f. o. b. the quarry. Before construction of the Denison Dam was commenced, the Cumberland Oil Field in Oklahoma had been discovered and oil was being produced. The field was so located that water impounded by the completed dam would flood part of it. As a part of the dam and reservoir project, the United States awarded a contract for the construction of a dyke for the purpose of preventing the field from being inundated. The contractor for the construction of the dyke sublet part of its contract and the subcontractor sublet to the defendant in this suit a part of its contract for the production of gravel cushion and riprap for use in the construction of the dyke. The terms of the contract were similar to the contracts relating to the railroad and the highway, except that the defendant agreed to and did haul a large quantity of stone from the quarry to the dyke site. Plaintiffs in this case were employed by the defendant as mechanics, laborers, and power shovel operators at the quarry. Their work consisted of mining, processing and producing stone used for gravel cushion and riprap; and, in addition, some of the plaintiffs hauled stone from the quarry to the dyke site where it was dumped from the truck either directly onto the dyke or into cranes which spread it on the dyke. Frequently, the rock dumped would not

have to be placed or spread by others on the dyke but would fall into proper place. The distance between the quarry and the work site of the several projects averaged about twelve miles. None of the rock quarried and processed moved outside the state.

The trial court determined that plaintiffs, in quarrying and processing rock for use in connection with the construction of the relocated portions of the railroad track and the highway, were not engaged in commerce but were engaged in the production of goods for commerce, within the meaning of the Act, and were entitled to recover; and that in quarrying and processing rock for use in connection with the construction of the dyke and in hauling rock from the quarry to the dyke site; plaintiffs were not entitled to the benefits of the Act and should not recover. Judgment was entered accordingly. The defendant appealed from that part of the judgment awarding recovery under the Act for services performed in connection with the gravel cushion and riprap used on the railroad and the highway. The plaintiffs perfected a cross appeal from that part denying them recovery under the Act for the services rendered in the processing of the gravel cushion and rock used in the construction of the dyke and in hauling rock from the quarry to the dyke site. The cross appeal also challenged the allowance made for attorney's fees.

Taking up the direct appeal, by its terms section 7 of the Act makes the provisions relating to maximum hours applicable to two classes of employees. They are those engaged in commerce and those engaged in the production of goods for commerce. And section 3(j) provides that "an employee shall be deemed to have engaged in the production of goods [for commerce] if such employee was employed * * * in any process or occupation necessary to the production" of goods for commerce. But it is the contention of the company that the employees here involved, while engaged in mining, producing and processing the gravel cushion and riprap for use in the construction of the relocated portions of the railroad and the highway, were not engaged in the production of goods for commerce, or in a process or occupation necessary to such production. No rule of thumb has yet been enunciated either by Congress or the courts by which it can be determined in every case whether the employee was engaged in the production of goods for commerce, within the meaning of the Act. Each case depends upon its own facts. However, certain general guides have been blue-printed. It is not necessary that the employee must himself take part in the physical process of the making of the goods. It suffices if his work constitutes a part of the integrated effort by which goods are produced for commerce. Stated otherwise, it is enough if the work of the employee has such "close and immediate tie with the process of production for commerce" that it is in effect a part of it. Kirschbaum Co. v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 1121, 86 L.Ed. 1638; Warren-Bradshaw Co. v. Hall, 317 U.S. 88, 63 S.Ct. 125, 87 L.Ed. 83; Walton v. Southern Package Corp., 320 U.S. 540, 64 S.Ct. 320, 88 L.Ed. 298; Armour & Co. v. Wantock, 323 U.S. 126, 65 S.Ct. 165; The Borden Co. v. Borella, 325 U.S. 679, 65 S.Ct. 1223. But Congress did not intend in the enactment of the Act to exert the full measure of its commerce power. Instead, it was purposed to leave local business to the protection of the states, and courts are not free to absorb by judicial process essentially local activities which Congress in the exercise of its judgment did not see fit expressly or by fair implication to bring within the scope of the Act. Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460; 10 East 40th Street Co. v. Callus, 325 U.S. 578, 65 S.Ct. 1227; Rucker v. First National Bank of Miami, 10 Cir., 138 F.2d 699, certiorari denied 321 U.S. 769, 64 S.Ct. 524, 88 L.Ed. 1065.

Section 3(b) of the Act · defines commerce to mean "trade, commerce, transportation, transmission, or communication. among the several States or from any State to any place outside thereof." This definitive provision is merely declaratory of the generally understood and accepted meaning of interstate commerce as applied to goods and products, namely their movement across state lines. It thus is manifest that every employee engaged in the production of goods, or in a process or occupation necessary to such production, is not necessarily within the coverage of the Act. In order to come within its coverage, an employee must be engaged in the production of goods for commerce, or in a process or occupation necessary to such production. The very language of the Act relating to the production of goods for commerce

seems to make it clear that the particular work of the employee, or the integrated effort of which his service is a part, must have for its purpose the production of goods for transportation in commerce. Some goods or some commodities must be produced for movement in commerce. That must be the purpose of the work of the particular employee or of the integrated effort of which his work is a part. In Kirschbaum Co. v. Walling, supra, it was held that engineers, firemen, elevator operators, porters, carpenters, electricians, and watchmen employed in their respective capacities in connection with the maintenance and operation of a loft building were engaged in the production of goods for commerce. But clothing was manufactured in the building and sold for movement in interstate commerce. In Warren-Bradshaw Co. v. Hall, supra, employees of a company engaged as an independent contractor in drilling oil wells were awarded recovery under the provisions of the Act, but there the integrated effort was the production of oil for movement in commerce. In Walton v. Southern Package Corp., supra, it was held that the night watchman of a plant was within the coverage of the Act, but in the plant veneer was manufactured from logs and sold for movement in commerce. In Armour & Co. v. Wantock, supra, fireguards employed in the plant of the company for the primary purpose of protecting the property against destruction by fire were held entitled to the benefits of the Act, but there soap was manufactured in the plant and shipped in commerce. And in The Borden Co. v. Borella, supra, porters, elevator operators, and night watchmen employed in the building owned and operated by the company recovered, but the company owned and operated plants and factories in the United States and Canada at which products were manufactured and processed for movement in commerce, and the entire enterprise was supervised, managed, and controlled from the building. The essence of the holding was that the porters, elevator operators, and watchmen bore such a close and immediate tie with the process of production of goods for commerce that they were an essential part of it within the meaning of the Act. But in 10 East 40th Street Co. v. Callus, supra, the employees were elevator starters and operators, window cleaners, watchmen, and other maintenance workers employed in a building rented to tenants for an unre-stricted variety of office work but no manufacturing was carried on within it; and it was held in effect that the business of renting office space in a building of that kind for all the usual miscellaneous catalogue of offices satisfies the common understanding of local business and that the maintenance and operation employees were engaged in local business, not the production of goods for commerce within the meaning of the Act. Here, it was not intended that any of the cushion gravel and riprap would ever move in interstate commerce. It was understood from the beginning that it would be produced, processed, and transported to points on the relocated segments of the railroad and the highway, all within the same state. The work of the employees in question, either separate and distinct or as an integral part of the integrated effort, did not have for its purpose the production or manufacture of any goods or commodity for movement in interstate commerce. Their work was not directed to the production or manufacture of anything for commerce, within the meaning of the Act. They were engaged in local business. 10 East 40th Street Co. v. Callus, supra; Rucker v. First National Bank of Miami, supra.

 Our attention is directed to the so-called ice cases, Hamlet Ice Co. v. Fleming, 4 Cir., 127 F.2d 165, certiorari denied, 317 U.S. 634, 63 S.Ct. 29, 87 L.Ed. 511; Atlantic Co. v. Walling, 5 Cir., 131 F.2d 518; Chapman v. Home Ice Co., 6 Cir., 136 F.2d 353, certiorari denied 320 U.S. 761, 64 S.Ct. 72, 88 L.Ed. 454; Hansen v. Salinas Valley Ice Co., 62 Cal.App.2d 357, 144 P.2d 896. In all of them, the ice company produced ice and sold it to a railroad company, an express company, or other like agency, for icing refrigerator cars, icing dining cars, icing shipments of less than car lots, or other similar purpose; and the major contention of the ice company was that since it sold the ice at the point of production to the transportation company, the production was local and therefore its employees were not within the coverage of the Act. That contention was rejected. But in wide difference from the facts here, it affirmatively appears in three of those cases and is fairly inferable in the fourth, that some of the ice actually moved across state lines before being consumed by use or otherwise, and that it was produced and sold with knowledge and

intent that it would move in that manner. It is true that in Atlantic Co. v. Walling, supra, the court said in effect that the production of goods for commerce, within the meaning of the Act, includes the production of goods for use by an instrumentality of interstate commerce as an essential part of such commerce, even though the particular goods produced do not move in commerce. But the Act does not speak of the production of goods for an instrumentality of commerce as distinguished from commerce itself. The Act is to be accorded a liberal construction. But the function of judicial interpretation of a statute is to bring out and give effect to that which is already in it, latent or otherwise. It is not to add new provisions, substantive or otherwise, which the legislative tribunal in the exercise of its permitted choice omitted or withheld. If Congress had intended to extend the coverage of the Act to employees engaged in the production of goods for a railroad or other instrumentality of interstate commerce, even though the goods were not to move in commerce, it certainly would have employed apt words to express the intention. We fail to find anything in the language of the Act or its legislative history which lends support to the view that Congress purposed to bring workmen of that class within the coverage.

■ The appellees on the direct appeal advance the contention that, while quarrying and processing the cushion gravel and riprap for use in the construction of the relocated segments of the railroad and the highway, they were engaged in commerce. Whether an employee bears a sufficiently close and immediate tie to commerce as to be a part of it within the meaning of the Act is a question of degree of proximity. In order to be engaged in commerce within the scope of the Act, the employee must be actually engaged in the movement of commerce or the service which he performs must be so closely related to it as to be for all practical purposes a part of it. McLeod v. Threlkeld, 319 U.S. 491, 63 S.Ct. 1248, 87 L.Ed. 1538; Rucker v. First National Bank of Miami, supra; Clyde v. Broderick, 10 Cir., 144 F.2d 348; New Mexico Public Service Co. v. Engel, 10 Cir., 145 F.2d 636. "Employee activities outside of this movement, so far as they are covered by the wage-hour regulation, are governed by the other phrase, 'production of goods for com-merce'." McLeod v. Threlkeld, supra [319 U.S. 491, 63 S.Ct. 1251.] Off-the-railroad and off-the-highway employees, working at a remote point in the mining, production, and processing of gravel cushion and riprap for use in the construction of relocated portions of the railroad and the highway, are not engaged in the movement of commerce or so closely related to it as to be for all practical purposes a part of it, within the meaning of the Act. McLeod v. Threlkeld, supra.

■ Turning to the cross-appeal, it is contended that the court erred in declining to award recovery under the Act for the services rendered in mining, producing, and processing the gravel cushion and riprap for use in the construction of the dyke, and in hauling some of the rock from the quarry to the site of the dyke. The oil field had been discovered before construction of the Denison Dam was commenced. Oil was being produced and it moved in interstate commerce. The purpose in constructing the dyke was to prevent the field from being flooded and thus permit the continued and uninterrupted production of the oil. The trial court so found and the finding is not assailed. Cushion gravel and riprap rock were necessary for the construction of the dyke. Quarrying the rock, processing it, and hauling some of it to the dyke constituted part of the integrated effort having for its purpose the protection of the oil field from being flooded in order that production of oil and its movement in interstate commerce might continue. While bearing that close and immediate tie to the integrated effort designed to effectuate the continued production of oil and its movement in interstate commerce, the employees were engaged in the production of goods for commerce and therefore should have been awarded the benefits of the Act. Kirschbaum Co. v. Walling, supra; Warren-Bradshaw Co. v. Hall, supra; Walton v. Southern Package Corp. supra; Armour & Co. v. Wantock, supra; The Borden Co. v. Borella, supra; Walling v. Amidon, 10 Cir., 153 F.2d 159. And they were not excluded from coverage merely because they were in the employ of an independent contractor, not financially interested in the oil wells or the oil produced and shipped in commerce. Warren-Bradshaw Co. v. Hall, supra.

■ The final contention advanced on the cross-appeal relates to the award for attorneys' fees. The court included

in the judgment $500 as fees for the services of the attorneys for plaintiffs in the district court, and the further sum of $300 in the event of an appeal to this court. It is argued that the allowance was too small. Section 16(b), supra, vests in the trial court a broad discretion in the fixing of fees for attorneys. The discretion is to be exercised with sound judgment. But the action of the court in making the allowance will not be disturbed on appeal unless the discretion was abused. Sullivan & Cromwell v. Colorado Fuel & Iron Co., 10 Cir., 96 F.2d 219. The amount allowed in this instance was not so grossly inadequate as to constitute an abuse of discretion.

The judgment is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

PHILLIPS, Circuit Judge (concurring in part and dissenting in part).

Clifton, for himself and as agent for 47 other persons, brought this action against the E. C. Schroeder Company, Inc.,[1] to recover overtime compensation and liquidated damages and attorneys' fees under § 16(b) of the Fair Labor Standards Act of 1938,[2] 29 U.S.C.A. § 216(b).

The facts are not in dispute. By the Act of June 28, 1938, 52 Stat. 1215, 1219, Congress authorized the construction of the Denison Dam and Reservoir for flood control and other purposes. Work was commenced on the project in the early part of 1942.

Because the waters impounded by the completed dam would inundate portions of the railroad track of the St. Louis-San Francisco Railway Company, an interstate railroad and an instrumentality of interstate commerce, and U. S. Highway No. 70, an interstate highway and an instrumentality of interstate commerce, the United States entered into contracts with various contractors for the relocation of approximately 18.71 miles of railroad and approximately 3.8 miles of highway. The relocation sites for the railroad and highway were upon raw, unimproved land. It was necessary to survey, clear, grade, fill, and excavate the relocation sites. Piling was driven and concrete superstructures constructed. New roadbeds, one bridge for the relocated highway, and two bridges for the relocated railroad track were built.

The plans and specifications called for cushion and riprap rock to be placed on the approaches to the bridges where the waves from the lake would beat against them. Schroeder sold to the prime contractors the cushion and riprap rock delivered onto trucks at its quarries. The entire cost of construction was paid by the United States. The rock quarries were situated in Oklahoma. They were opened and operated especially to produce the gravel and rock for the relocation projects. During the period of construction no traffic passed over the new segment of railroad. After it was completed, interstate commerce did, and has continued to, move over it. During the period of construction and on the date the judgment was rendered below, no traffic had moved over the new segment of highway. When it is completed, interstate commerce will move over it. The cushion and riprap rock was all produced within the State of Oklahoma, and did not at any time go out of the State of Oklahoma nor cross any state line.

Cumberland Oil Field lies along the banks of the Washita River in Bryan and Marshall Counties, Oklahoma. But for the construction of the dike, hereinafter referred to, water from the dam would have inundated the oil field. The United States awarded, as a part of the dam and reservoir project, a contract for the construction of a dike to confine the impounded waters so they would not inundate the oil field. Had the dike not been built, the production of oil would have been interfered with substantially. Oil produced from the field moves in interstate commerce. The prime contractor for the dike subcontracted a part of the work to Lambert Bros., Inc., and that company made a subcontract with Schroeder to furnish the rock for the dike. The rock used in the dike was produced from the quarries in Oklahoma, and was not moved outside the state.

Certain of the plaintiffs below were laborers, mechanics, and power shovel operators engaged in the work of producing the cushion and riprap rock at the quarries. The rock was hauled and placed on the highway and railroad by other workmen.

Certain of the plaintiffs below were engaged in the work of producing rock at the quarries for the dike. Some were engaged in hauling the rock to the dike

---

[1] Hereinafter referred to as Schroeder.

[2] Hereinafter referred to as the Act.

and dumping it on or near by the dike. The rock not dumped directly in the dike was moved into place by a crane.

The trial court held that the workmen engaged in producing rock for the railroad and highway projects were within the coverage of the Act and that the other workmen were not. It awarded judgment accordingly. Schroeder appealed and the plaintiffs below cross-appealed.

### The Employees Engaged in the Production of Cushion and Riprap Rock for the Highway and Railroad

The question is whether the employees engaged in the production at the quarries of the cushion and riprap rock for the new segments of railroad and highway were engaged in commerce. The test under the Act "to determine whether an employee is engaged in commerce, is not whether the employee's activities affect or indirectly relate to interstate commerce but whether they are actually in or so closely related to the movement of the commerce as to be a part of it."[3]

In Rucker v. First National Bank of Miami, Okl., 10 Cir., 138 F.2d 699, 704, we said: "Whatever may have been the doubts and differences along the way, it now seems fairly plain that the phrase 'engaged in commerce,' when used to measure coverage under the Fair Labor Standards Act, encompasses only employment actually in the 'movement of commerce,' or activities so closely related thereto as to be practically a part of it. In other words, 'engaged in commerce' means engaged in the interstate transportation or movement of commerce."

In construing the "in commerce" provision in the Act, the Supreme Court has drawn from its decisions construing an analogous provision of the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. In Overstreet v. North Shore Corporation, 318 U.S. 125, 131, 63 S.Ct. 494, 498, 87 L.Ed. 656, the court said: "The Federal Employers' Liability Act and the Fair Labor Standards Act are not strictly analogous, but they are similar. Both are aimed at protecting commerce from injury through adjustment of the master-servant relationship, the one by liberalizing the common law rules pertaining to negligence and the other by eliminating substandard working conditions."

And, in McLeod v. Threlkeld, 319 U.S. 491, 495, 63 S.Ct. 1248, 87 L.Ed. 1538, the court said: "Judicial determination of the reach of the coverage of the Fair Labor Standards Act 'in commerce' must deal with doubtful instances. There is no single concept of interstate commerce which can be applied to every federal statute regulating commerce. See Kirschbaum Co. v. Walling, 316 U.S. [517], 520, 62 S.Ct. [1116], 86 L.Ed. 1638. However, the test of the Federal Employers' Liability Act that activities so closely related to interstate transportation as to be in practice and legal relation a part thereof are to be considered in that commerce, is applicable to employments 'in commerce' under the Fair Labor Standards Act." See, also, Rucker v. First National Bank of Miami, Okl., 10 Cir., 138 F.2d p. 703.

If the cushion and riprap rock had been used to repair or maintain an existing operating railroad, the question here presented would be more narrow.[4] However, such rock was used in the construction of new segments of railroad and highway to take the place of segments of an existing railroad and highway that would be inundated by the lake. At the time the labor was performed, neither new segment was being used as an instrumentality of commerce.

In Pedersen v. Delaware, L. & W. R. Co., 229 U.S. 146, 151, 152, 33 S.Ct. 648, 649, 57 L.Ed. 1125, the court held that an employee who was injured while carrying bolts to be used in repairing a railroad bridge, over which interstate trains passed, was engaged in interstate commerce within the meaning of the Federal Employers' Liability Act. It was pointed out that the tracks and bridges were indispensable to interstate commerce, and "that the work of keeping such instrumentalities in a proper state of repair while thus used is so closely related to such commerce as to be in practice and in legal contemplation a part of it." But the court was careful to distinguish between existing instrumentalities of interstate commerce and construction which had not yet become such instrumentalities, saying: "Of course, we are not here concerned with the construction of tracks, bridges, engines, or cars, which have not as yet become instrumentalities in such commerce, but only with

---

[3] McLeod v. Threlkeld, 319 U.S. 491, 497, 63 S.Ct. 1248, 1251, 87 L.Ed. 1538.

[4] See Overstreet v. North Shore Corporation, 318 U.S. 125, 63 S.Ct. 494, 87 L.Ed. 656.

the work of maintaining them in proper condition after they have become such instrumentalities and during their use as such."

The Federal Employers' Liability Act does not apply to original or new construction.[5]

In Bamberger Electric R. Co. v. Winslow, 10 Cir., 45 F.2d 499, 500, we said: "Where an employe is engaged in work upon or directly in connection with an instrumentality which is being used in interstate commerce, such employe is employed in interstate commerce. On the other hand, where the instrumentality, upon which the employe is at work or in connection with which he is employed, has not yet been dedicated to use in interstate commerce, although it may be intended for use ultimately in such commerce, such work ordinarily is not so closely related to interstate commerce as to be practically a part of it."

In New York Central R. R. Co. v. White, 243 U.S. 188, 191, 192, 37 S.Ct. 247, 248, 61 L.Ed. 667, L.R.A.1917D, 1, Ann.Cas.1917D, 629, the court said: "The admitted fact that the new station and tracks were designed for use, when finished, in interstate commerce, does not bring the case within the Federal act. The test is, 'Was the employee at the time of the injury engaged in interstate transportation or in work so closely related to it as to be practically a part of it?' Shanks v. Delaware, Lackawanna & Western R. R. Co., 239 U.S. 556, 558, 36 S.Ct. 188, 60 L.Ed. 436, 438, L.R.A.1916C, 797. Decedent's work bore no direct relation to interstate transportation, and had to do solely with construction work, which is clearly distinguishable, as was pointed out in Pedersen v. Delaware, Lackawanna & Western R. R. Co., 229 U.S. 146, 152, 33 S.Ct. 648, 57 L.Ed. 1125, 1128, Ann.Cas.1914C, 153. And see Chicago, Burlington & Quincy R. R. Co. v. Harrington, 241 U.S. 177, 180, 36 S.Ct. 517, 60 L.Ed. 941, 942; Raymond v. Chicago, Milwaukee & St. Paul Ry. Co., 243 U.S. 43, 37 S.Ct. 268, 61 L.Ed. 583."

Since the new construction had not yet become instrumentalities of interstate commerce at the time the labor was performed, it is my opinion that the activities of the employees who produced the rock were not actually in or so closely related to the movement of interstate commerce as to be a part of it.[6]

Counsel for the Administrator filed a brief as amicus curiae, in which a new theory of the meaning of the words "in commerce" is advanced. They urge that under the holdings in the so-called Ice Cases,[7] the workmen producing the rock were engaged in the production of goods for commerce. It is my view that the doctrine of the Ice Cases has no application in the instant cases. The rock was not produced to supply the needs of interstate commerce, to serve as an essential part of such commerce, nor to aid or facilitate the carrying on of such commerce by essential instrumentalities or facilities of commerce. It was produced in order to construct new segments of railroad and highway that had not yet become instrumentalities in such commerce.

### The Workmen Engaged in Quarrying and Hauling Rock for the Construction of the Dike

The dike itself was not an instrumentality of interstate commerce. The dike was constructed to confine the waters on lands acquired by the United States and prevent the inundation of the oil field. The government could have condemned the oil field, or otherwise acquired the title, and permitted the waters to inundate the field. It chose to construct the dike and prevent inundation of the oil field. The government constructed the dike to confine the waters within the area where it had the lawful right to impound them. That was the primary purpose for constructing the dike. The instant case, in my opinion, is distinguishable from watchmen or firemen employed to protect factories or manufacturing plants engaged in the production of goods for commerce.

---

[5] New York Central R. R. Co. v. White, 243 U.S. 188, 191, 192, 37 S.Ct. 247, 61 L.Ed. 667, L.R.A.1917D, 1, Ann.Cas. 1917D, 629; Raymond v. Chicago, M. & St. P. Ry. Co., 243 U.S. 43, 37 S.Ct. 268, 61 L.Ed. 583; Hallstein v. Pennsylvania R. Co., 6 Cir., 30 F.2d 594, 595, and cases there cited.

[6] See Nieves v. Standard Dredging Corp., 1 Cir., 152 F.2d 719.

[7] Hanson v. Salinas Valley Ice Co., 62 Cal.App.2d 357, 144 P.2d 896; Hamlet Ice Co. v. Fleming, Administrator, 4 Cir., 127 F.2d 165; Atlantic Co. v. Walling, Administrator, 5 Cir., 131 F.2d 518; Chapman v. Home Ice Co. of Memphis, 6 Cir., 136 F.2d 353.

See Armour & Co. v. Wantock, 323 U.S. 126, 65 S.Ct. 165; Kirschbaum Co. v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638; Mid-Continent Pipe Line Co. v. Hargrave, 10 Cir., 129 F.2d 655. In those cases, the workmen were employed primarily to protect the manufacturing establishments engaged in the production of goods for commerce. Here, the workmen were employed primarily to construct a dike to confine the waters within an area which the United States had the right to submerge. The oil producer had no relationship, contractual or otherwise, with the United States, the contractors who constructed the dike, or such contractors' employees.

In solving the problem what is required is a "practical judgment as to whether the particular employer actually operates the work as part of an integrated effort for the production of goods," [8] and as was said by the court in 10 East 40th Street Bldg., Inc., v. Callus, 325 U.S. 578, 582, 65 S.Ct. 1227, 1229, "We cannot 'be unmindful that Congress in enacting this statute plainly indicated its purpose to leave local business to the protection of the states.' We must be alert, therefore, not to absorb by adjudication essentially local activities that Congress did not see fit to take over by legislation."

It is true that the dike will protect the oil field from inundation. But, inundation would have resulted not from any condition present in the oil field, any natural condition surrounding the field, nor any factor incident to the production of oil, but solely because of the construction of the dam and reservoir. Therefore, it seems to me the work in constructing the dike was not a part of an integrated effort for the production of oil.

It is my opinion that the work of the employees in quarrying the rock and hauling it to the dike did not have such a close and immediate tie with the process of production for commerce in the oil field as to be regarded as necessary to such production within the meaning of § 3 of the Act.

Accordingly, I concur in the reversal in No. 3176 and would affirm in No. 3178.

HUXMAN, Circuit Judge (concurring in part and dissenting in part).

I concur in the reversal in No. 3178, but dissent in No. 3176. I am of the opinion that the judgment of the trial court in No. 3176 should be affirmed.

---

[8] Armour & Co. v. Wantock, 323 U.S. 126, 130, 65 S.Ct. 165, 167; Walling, Administrator v. Amidon, 10 Cir., 153 F.2d 159.