TOBIN, Secretary of Labor, v. PENNING-
TON–WINTER CONST. CO., Inc.

No. 4443.

United States Court of Appeals
Tenth Circuit.

July 2, 1952.

Rehearing Denied Aug. 2, 1952.

Murrah, Circuit Judge, dissented.

Bessie Margolin, Asst. Sol., United States Department of Labor, Washington, D. C. (William S. Tyson, Sol., William A. Lowe and Sylvia S. Ellison, Attys., United States Department of Labor, Washington, D. C., and Earl Street, Regional Atty., United States Department of Labor, Dallas, Tex., were with her on the brief), for appellant.

H. L. Douglass, Oklahoma City, Okl. (Sylvanus G. Felix and John J. Griffin, Oklahoma City, Okl., were with him on the brief), for appellee.

Before BRATTON, HUXMAN and MURRAH, Circuit Judges.

HUXMAN, Circuit Judge.

This was an action by Maurice J. Tobin, as United States Secretary of Labor, to compel compliance on the part of Pennington-Winter Construction Company, Inc., the appellee, with the over-time compensation provisions of the Fair Labor Standards Act of 1938,[1] with respect to laborers employed by it under its contract for work to be performed on what is known as the Tenkiller Ferry Dam. It is conceded that there was no compliance with the provisions of the act. So it is also stipulated that while work under the contract on this project is completed the question is not moot because of other contracts in which the identical question is present. The decision turns upon whether appellee's employees were engaged in commerce or the production of goods for commerce within the meaning of the act. The trial court held that they were

1. As amended, 29 U.S.C.A. § 201 et seq.

not so engaged and entered judgment for appellee.

Tenkiller Ferry Dam is a multiple purpose project for flood control, generation of electric power, aid to navigation and recreational and other beneficial uses. It is being constructed across the Illinois River in Sequoyah and Cherokee Counties, Oklahoma, under valid federal statutory authority. It is an integral part of a comprehensive system for the control of the Arkansas and Mississippi Rivers, recommended by the Corps of Engineers for the United States and approved by the Congress of the United States in appropriate authorizing legislation.

The Illinois River, a non-navigable stream, is a tributary of the Arkansas River, which in turn empties into the Mississippi River. The Arkansas and Mississippi Rivers are both navigable. As found by the trial court, the comprehensive plan for the control of these two rivers "is intended to and does improve their navigability and their usefulness as channels of interstate commerce and said comprehensive plan is intended to and will provide a channel nine feet in depth and 250 feet in width to mile 428 on the said Arkansas River." The trial court also found that "Tenkiller Ferry Reservoir is intended to and will furnish approximately ten per cent of the flow of water necessary to create and maintain said channel." With respect to flood control the trial court found that "Many concerns engaged in the production of goods for interstate commerce are located, and substantial quantities of cotton and other crops intended for shipment in interstate commerce are located in the flood plains of the Arkansas River below the confluence of said river and of the Illinois River. To the extent that the Tenkiller Ferry Reservoir controls the floods and the flow of water in the Arkansas and Mississippi Rivers, it will afford protection from floods to such concerns and such crops." The trial court also found that the flood protection afforded by this construction would benefit interstate railways and highways located in the project area.

Appellee's contract required it to remove trees and obstructions from the reservoir

area. The work under the contract was to be performed in that portion of the basin denominated Zones A and B. The Zone A clearing was performed from the bottom of the reservoir to elevation 615. The work consisted of removing all floatable material described in the contract as "pieces four inches or more in diameter and five feet or more in length," as well as all dead and leaning trees likely to break loose and float, and lowering or topping to elevation 615 all anchored structures including fences, living trees, and brush, except in certain blocked out areas, projecting above that elevation. The Zone B clearing was performed between elevation 615 and 634. It consisted of removing all floatable material, removing or felling (by cutting only in the case of willows) all trees, except those in the blocked out areas, in a manner so as to leave no stump higher than six inches above ground on the high side and treating willow stumps with arboricide to prevent sprouting. In addition, appellee was required to construct brush rows at certain places to aid the propagation of fish. The brush row construction was a small item of the work for which no special payment was provided, because the contract provided that it "be considered as a subsidiary obligation of the contractor." This in general describes the nature and the character of the work performed by the employees of appellee in fulfilment of its contractual obligations. The trial court based its conclusion that the employees were not subject to the provisions of the act upon its conclusion of law Number 7 that "The work of the employees of defendant did not include the production of goods in commerce, nor was their work closely related to production of goods in commerce, nor was their work directly essential to the production of any goods for commerce. My conclusion from the evidence is that the work of the employees of the defendant was primarily related to recreational activities in the area, and the propagation and protection of fish and game and will have very little, if any, effect upon interstate commerce."

We are of the view that the court's conclusion that the work of appellee's em-

ployees was primarily related to recreational activities is not supported by the record. The evidence is clear that the recreational facilities were a very small part of the project and of the work done by the appellee. The only work solely for recreational activities was the construction of brush rows for the propagation and protection of fish and the removal of certain obstructions in the upper levels of the dam. The removal of such obstructions will, of course, improve navigation for pleasure boats, but common knowledge also tells us that even these activities will improve the flow of water and thus have a bearing on obstructions coming down during high water and thereby affect the dam itself. But of more vital significance is the fact that the major portion of the work in question consisted of removing trees, logs and obstructions which would float against the dam, tend to clog the intakes, damage the gates, and interfere with the operation of the hydro-electric power equipment and the spillway for the flood pools. These conclusions are supported by the unimpeached testimony of the Assistant Chief Engineer and the Hydro-Electric Engineer. These witnesses also testified that while the construction of the brushrows was primarily for recreational purposes that even this construction was beneficial to the dam in that it tied them down and prevented them from floating and becoming obstructions lodging against the dam. Removing clogs, trees and obstructions in the lake bed, which might break loose and float against the dam, clog the intakes and interfere with the operations of the dam, and cause injury to it are as much a necessary and essential part of the construction of the dam as is the proper construction of ramps, abutments, and footings to prevent the washing-out and under-mining of the dam.

To further support the judgment of the trial court, appellee relies upon a line of cases holding that employees engaged in the construction of a new building or structure to be dedicated, when completed, to the production of goods for commerce are not themselves during the period of construction so closely related to commerce as to bring them within the coverage of the Act.[2] But this is not new construction in the sense that a new building for the manufacture of goods for commerce is new construction. Such a building by its mere construction is no part of commerce and has without more no active connection or relation thereto. It does not follow from the mere construction of such a building that it ever will have connection with commerce or be dedicated to the production of goods for commerce. It could, after its construction, be dedicated solely for intrastate commerce, if its owners deem such use advisable.

But here we have in force and effect a comprehensive plan for improvement of navigation on the Arkansas and Mississippi Rivers, two navigable streams. Many levees, dams and other works have been constructed to effectuate such purposes, both upon the streams themselves, as well as on their tributaries. The construction of this dam is no more than an improvement of an existing project for the control of floods and the betterment of navigation. It is no more a new construction separated from commerce or the production of goods for commerce than is a new levee or embankment constructed along these streams, where none now exists, and the construction of which will, together with like levees, improve navigation and flood control now in effect. In line with this reasoning is Walling v. Patton-Tulley Transportation Co., 6 Cir., 134 F.2d 945, where it was held that employees engaged in the construction of dikes and revetments in the Missouri and Mississippi Rivers were engaged in the production of goods for commerce. (See also cases therein cited.)

The only distinction between the Walling case and the one before us is that there the construction was directly on the two navigable rivers, while here the construction is on the Illinois River, a non-navigable tributary of the Arkansas River and a part of the Arkansas, Missouri and Mississippi watershed. But this is immaterial

2. See McDaniel v. Brown & Root, 10 Cir., 172 F.2d 466, and Kelly v. Ford, Bacon & Davis, Inc., 3 Cir., 162 F.2d 555.

as far as it concerns the question before us. State of Oklahoma ex rel. Phillips v. Guy F. Atkinson Co., D.C., 37 F.Supp. 93, involved the construction of the Denison Dam on the non-navigable part of the Red River. A three-judge court there held that the jurisdiction of the Federal Government under the Commerce Clause extended to the non-navigable as well as to the navigable part of the stream. On appeal the Supreme Court upheld this ruling. See State of Oklahoma ex rel. Phillips v. Guy F. Atkinson Co., 313 U.S. 508, 61 S.Ct. 1050, 1059, 85 L.Ed. 1487. The Supreme Court, however, went further and held that the jurisdiction of Congress covered the entire watershed of a navigable stream. Thus the court said: "We would, however, be less than frank if we failed to recognize this project as part of a comprehensive flood control program for the Mississippi itself. * * * There is no constitutional reason why Congress cannot under the commerce power treat the watersheds as a key to flood control on navigable streams and their tributaries." And again the court said: "And we now add that the power of flood control extends to the tributaries of navigable streams. For just as control over the non-navigable parts of a river may be essential or desirable in the interests of the navigable portions, so may the key to flood control on a navigable stream be found in whole or in part in flood control on its tributaries."

The construction of levees, dams and other improvements on any of the streams within the watershed of the Missouri and Mississippi Rivers, constructed for the purpose of aiding navigation and preventing floods, must be considered as items of a single project undertaken to effectuate such purposes. The construction of a new levee or a new dam is not to be considered as a separate construction. They are no more than an addition to, or an improvement of, an existing instrumentality of interstate commerce. A number of cases have held that workers on new construction, which constitutes an improvement of an instrumentality of interstate

commerce, are during the period of such construction under the act.[3]

It is true, as pointed out by appellee, that Congress by the 1949 Amendment to the Fair Labor Standards Act narrowed the scope of its application and evidenced an intent not to extend the act to the ultimate scope of Congressional power. Under the Amendment, the act would no longer apply to such workers as were held under the act by this court in E. C. Schroeder Co. v. Clifton, 10 Cir., 153 F.2d 385. But the employees in question in the Schroeder case were in an entirely different category from those in this case. They were engaged in quarrying stone in a stone quarry entirely removed from the dam project. All they did was quarry the stone and transport it to the construction site. Here the employees work directly on the construction project. They are directly and intimately connected with the project and as closely related thereto and its basic functions as those engaged in excavating the bed of the dam site or those engaged in pouring the mortar for the abutments, spillways and other improvements necessary for the safety and successful, economical and efficient operation of the project.

Reversed.

MURRAH, Circuit Judge (dissenting).

I would affirm the judgment of the trial court. As I interpret the majority opinion, it is based upon the premise that the scope of the Wage and Hour Act is co-extensive with the constitutional power of Congress under the commerce clause to construct multiple-purpose dams and reservoirs on nonnavigable tributaries of navigable streams. State of Oklahoma ex rel. Phillips v. Guy F. Atkinson Co., 313 U.S. 508, 61 S.Ct. 1050, 85 L.Ed. 1487, is cited in support of the Congressional power to authorize and appropriate for the construction of the dam and reservoir as a part of a comprehensive system of flood control, electric power and navigation—a power now undoubted. From there, the majority proceeds to reason that because Con-

3. Walling v. Patton-Tulley Transportation Co., 6 Cir., 134 F.2d 945; Ritch . v. Puget Sound Bridge & Dredging Co., 9 Cir., 156 F.2d 334; Pederson v. J. F. Fitzgerald Const. Co., 318 U.S. 740, 742, 63 S.Ct. 558, 87 L.Ed. 1119.

gress is constitutionally empowered to construct such projects, the Wage and Hour Act ipso facto covers all those employees engaged in such activities.

But coverage under the Wage and Hour Act is not coextensive with the constitutional power of Congress over interstate commerce. Since the inception of the Act, the courts have recognized that Congress did not intend to extend it to all employees who might be engaged in some activity affecting interstate commerce. Kirschbaum Co. v. Walling, 316 U.S. 517, 523, 62 S. Ct. 1116, 86 L.Ed. 1638; Rucker v. First Nat'l Bank of Miami, 10 Cir., 138 F.2d 699, 702; E. C. Schroeder Co. v. Clifton, 10 Cir., 153 F.2d 385, 388. Cf. Polish Alliance v. Labor Board, 322 U.S. 643, 64 S.Ct. 1196, 88 L.Ed. 1509; N.L.R.B. v. Tri-State Casualty Ins. Co., 10 Cir., 188 F.2d 50. On the contrary, Congress delineated the coverage to include only employees engaged in commerce or in the production of goods for commerce. According a liberal construction to these phrases, the courts included employees whose activities, while not in the actual stream of commerce, were so close and intimately connected therewith as to be for all practical purposes a part of commerce. See Kirschbaum Co. v. Walling, supra; Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460; Rucker v. First Nat'l Bank of Miami, supra; E. C. Schroeder Co. v. Clifton, supra.

Thus, the courts interpreted the words of coverage to include employees of a local fertilizer company engaged in selling all of its fertilizer to local farmers for use on land where products were grown to be sold for processing of sugar which was sent out of the state. McComb v. Super-A Fertilizer Works, 1 Cir., 165 F.2d 824. And, employees of a rock quarry engaged in mining of stone to be used in the construction of a dike in the same state, the purpose of which was to prevent the flooding of an oil field where oil was produced for interstate commerce, were held covered in E. C. Schroeder Co. v. Clifton, supra. And, employees of a window-cleaning company, whose activities were wholly within the state, but some of whose customers were engaged in interstate commerce or the production of goods for commerce were covered in Martino v. Michigan Window Cleaning Co., 327 U.S. 173, 66 S.Ct. 379, 90 L.Ed. 603.

But, such broad interpretation of the words of coverage led Congress to expressly repudiate them, and to redefine coverage of employees as those directly engaged in commerce "or in any closely related processes or occupation directly essential to the production thereof in any state." See Amendment of October 26, 1949, Chap. 763, Sec. 3, 63 Stat. 911. And see Statement of House Conferees, Report No. 1453, 81st Congress, pp. 14–15. I would heed the Congressional admonishment not to judicially legislate beyond its expressed intent.

I cannot agree that the work of clearing this reservoir of timber is no more than an improvement of an existing project for the control of floods and the betterment of navigation as in Walling v. Patton-Tulley Transp. Co., 6 Cir., 134 F.2d 945, and Ritch v. Puget Sound Bridge & Dredging Co., 9 Cir., 156 F.2d 334. The employer's contract in our case called for a clearing of a portion of the reservoir site, including (a) the removal of trees and structures; (b) removal of underbrush, debris and fences; (c) disposal of cleared material; (d) treatment of cut willow stumps with arboricide, to prevent sprouting; and (e) construction of brush rows for fish hatchery purposes. This work was performed on a project which was not in the stream of commerce, but as an auxiliary aid to it, and it was also intended to provide purely local recreational facilities. Particularly, the evidence shows that the construction of the brush rows was for the purpose of propagating fish. There was evidence that the clearing of the underbrush, debris and fences was to prevent floatable material from obstructing the free flow of the water over the dam. But the record does not indicate that the activities in which these employees were engaged were more than remotely connected with interstate commerce or the handling of goods for interstate commerce. The record does not support the conclusion that they were engaged in an occupation "closely

related or directly essential to the production of goods." On the contrary, the trial court found and concluded from the evidence that the work of the employees was "primarily related to recreational activities in the area and the propagation and protection of fish and game, and will have very little if any effect upon interstate commerce." That finding is supported by the record, it is not clearly erroneous, and I cannot agree to set it aside.